**David JUAIRE, Plaintiff-Appellant,**

v.

**Terry W. NARDIN, Defendant,**

and

**Walter Marshak, Inc., Defendant-Appellee.**

**No. 381, Docket 31646.**

United States Court of Appeals
Second Circuit.

Argued April 3, 1968.

Decided June 4, 1968.

374

Sol Lefkowitz, New York City (Albert Averbach, Seneca Falls, N. Y., on the brief), for plaintiff-appellant.

Abraham Shapiro, New York City (Gold & Lerner, and Weisman, Celler, Allan, Spett & Sheinberg, New York City, on the brief), for defendant-appellee.

Before MOORE, WOODBURY* and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Plaintiff David Juaire, appeals from a verdict and judgment for defendant Walter Marshak, Inc., in the District Court for the Southern District of New York, John F. X. McGohey, Judge, in a motor vehicle negligence personal injury action in which jurisdiction is based on diversity of citizenship. The principal grounds urged for reversal are prejudicial conduct of defendant's counsel, error in admission of police reports and error in the charge and supplemental charge. We find no reversible error and affirm the judgment.

At about 1:00 a. m. on September 4, 1960, Terry Nardin was driving appellee's car on Route 6A near Provincetown, Mass. when he collided with a pedestrian, plaintiff David Juaire, who was lying or crawling on or near the highway. The two lane road, just under 20 feet wide, was straight and almost level. There were no street lights but the moon was full. Plaintiff testified that he had come to Cape Cod from Providence, R. I. in Rosemary Trainor's car to spend the weekend with 26-year old George Holland and 21-year old Rosemary. Juaire was only 18 years old. They had lunch at a beach, walked around Provincetown and then went to a picnic area, and in the evening went to a night club where they stayed from about 9:00 to midnight. They then had some coffee and there was some discussion about where to spend the night. Rosemary wanted to return to Providence but plaintiff wanted to stay because the trip was too long. In any event, Holland drove the car and when they got to a rest area about 2½ miles out of Provincetown Juaire got out of the car and the car pulled away. He walked to the end of the rest area and started to cross the highway when he tripped and fell into the road on his hands and knees. He saw lights coming from the right so he got up and then saw lights not more than 100 feet away coming from the other direction. He says that he stepped off the road onto the shoulder and while standing there was hit by the car and landed on the shoulder.

Nardin was travelling easterly between 25 to 30 or 30 to 40 MPH in a 40 MPH

* Of the First Circuit, sitting by designation.

zone and had just proceeded, according to his testimony, up a small rise when he and his passenger, now his wife, observed plaintiff directly in front of them, apparently rising up from a position on his hands and knees in the center of the eastbound lane. Nardin slammed on his brakes and swerved to the left, but plaintiff was struck by the front right side of the car and knocked off the road to the right. Nardin testified that there was a hill just before the place of the accident which prevented him from seeing plaintiff. This was supported by the police reports which in describing the road character, stated "Hillcrest (slight)," and by the photographs in evidence. It is contested by the plaintiff who asserts that the road was essentially flat. Although it is not pointed out in either of the briefs, the evidence also supports that a car coming from the opposite direction passed at about the same time, and might have decreased Nardin's vision.

The testimony of Nardin was corroborated in most of the essential details by two eye-witnesses, his passenger, Mrs. Jane Baron Nardin (married since the accident), and by Thomas B. Kinraide, who had observed the plaintiff prone or on his hands and knees in the middle of the eastbound lane of the highway while he was riding in a car going in a westerly direction. He also noticed the headlights of a car coming from the opposite direction and as his car passed the figure on the road, he saw defendant's car swerve to the left and stop. Kinraide's car made a U-turn and then he observed the plaintiff lying on or very near the shoulder.

On cross-examination plaintiff testified that he had picked up a six-pack of canned beer at a supermarket before lunch and drank one can at lunch. Rosemary and Holland each had two at lunch and the sixth can was not accounted for. That evening at the night club, plaintiff had 2½ bottles of beer and Rosemary had a gin drink. He denied that Rosemary was drunk but admitted that at a prior traffic hearing he had testified that Rosemary was very, very drunk, they had

a big argument and he got out of the car. He stated that it was his intention to walk back to town from the place he got out of the car.

The police reports, based on Officer Christopher's observation of the scene and his interviews with Nardin and Kinraide at the scene, stated that the plaintiff was crawling on the roadway and had been drinking so that his ability was impaired. They also stated that Nardin was going 25–35 miles per hour in the 40 MPH zone and travelled 35 feet after the impact.

The only testimony that Nardin might have been exceeding the speed limit came from Kinraide, who testified that the car in which he was a passenger was probably going from between 40 and 50 MPH and that the defendant's car, coming from the opposite direction, was going approximately the same rate. However, he was not watching the speedometer in the car in which he was riding and was not in a very good position to make an accurate estimate of the speed of the oncoming car.

Kinraide also could not recall the odor of plaintiff's breath but had signed a statement in his own handwriting on September 25, 1960 (three weeks after the accident), which refreshed his recollection that his impression at the time was that he smelled alcohol at the scene of the accident.

Dissatisfied with Exhibit 3, an official map or profile of the road which employed two different scales—1″ = 8′ for elevation and 1″ = 40′ for all other measurements—plaintiff's counsel, Lefkowitz, had someone draft Exhibit 3–A, a map apparently purporting to use the same scale for all measurements which appears in the original 3–A to be about 1″ = 11′.

In his summation to the jury, defendant's counsel, Hauptman made the following argument.

Mr. Hauptman: Exhibit 3–A, which purports to be an enlargement of Exhibit 3. Notice what kind of an enlargement it is, gentlemen and madam.

You notice the width of the road here (indicating)?

Look at the width of the road there (indicating). Much larger.

Look at the bottom part that is supposed to be a profile of the road. Do you notice the profile of the road compared to the width of the road? Do you see that, gentlemen? And why is it at least three times the width?

But on the proposed enlargement do you see what he did? He made the profile one quarter the size and enlarged the road area, this innocent lawyer who doesn't know how to try a case, and this is supposed to fool you.

The Court: Please. Don't—

Mr. Lefkowitz: I object to this, your Honor.

■ It is doubtful that Exhibit 3–A was intended to fool anybody; nor is it likely that it is inaccurate. Exhibit 3–A changed both scales and consequently, although the overhead sketch of the road in 3–A is wider, it appears to be in scale with the rest of 3–A. Thus, Hauptman's accusation is probably false. The presence of the two exhibits is, however, very confusing. Lefkowitz did not use an expert to introduce 3–A and because 3–A contains no legend indicating the scales, the responsibility for the confusion is probably his. Consequently, we cannot say that Hauptman's accusation constitutes unfair comment.

■ Hauptman's sarcastic reference to Lefkowitz as an "innocent lawyer who doesn't know how to try a case," while intemperate and improper, is not as outrageous as it seems at first blush and out of context. The record is replete with improper conduct on the part of Lefkowitz. On three occasions, Lefkowitz made fawning remarks about his own ineptitude as a lawyer, apparently for the purpose of currying favor and eliciting sympathy from the jury. In addition, on three other occasions, the court admonished Lefkowitz (in the absence of the jury) for his facial expressions of helplessness, and his gestures, following adverse rulings. In light of Lefkowitz'

self-deprecating airs of ineptitude and naiveté, Hauptman's sarcastic remarks were harmless. While the record suggests that the jury could well have found Lefkowitz' performance undesirable, Hauptman probably added little to the impression Lefkowitz himself created.

■ Appellant also contends that Hauptman used language during summation which implied that Lefkowitz had suppressed police photographs of the accident. In fact, however, Hauptman accused only the witness Christopher (a former police officer) of concealing the whereabouts of the photos. It is difficult to decide from the record whether Christopher's answers to questions about the location of the official original police records were clearly false, merely coy, or clearly honest, but Hauptman's argument in summation that Christopher was less than candid and impartial was permissible and not without support in the record. If the arguments are properly made as to Christopher, then the fact that they could also indirectly reflect on Lefkowitz does not render them improper. The appendices do not contain any direct suggestion by Hauptman that Lefkowitz was responsible for Christopher's lack of candor, although the jury could possibly have drawn such an inference.

■ During his summation, Hauptman stated:

"Now one thing I want to make clear. I want to say it now and get it out of the way. There is no doubt that the vehicle struck this man. There is no doubt about that at all. There is no doubt that he had some severe injuries, no doubt about that.

But I think, and I mention this, please, because I talk about it, *don't get the idea that I feel you should give him money, because, honestly, as sincerely as I can, I don't think he is entitled to a nickel.*"

■ From the context in which the italicized portion appears, it seems clear that the opinion expressed, although perhaps improper, was very insignificant

and completely harmless. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240–242, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), cited by appellant, which indicates that isolated and casual statements, although improper, are not prejudicial if they do not reflect the quality of the argument as a whole.

The police report which was received in evidence indicated that the police officer who prepared the report (Christopher) found that the driver Nardin had not committed any violation of the traffic laws, and on three occasions, Hauptman referred to this aspect of the police record. Appellant argues that Hauptman in fact knew that there had been a traffic hearing on an alleged violation and that the reference to the police report was thus serious and misleading conduct.

The briefs and appendices reflect occasional references to some hearing in Barnstable, Mass., but do not indicate what questions the hearing involved or what conclusions were reached. Thus, this argument at best appears to be unsupported by facts. Moreover, Christopher was available and could have testified about the hearing if the plaintiff had so wished.

■ Appellant contends references to insurance were improper. There was never any direct suggestion that the appellee was insured. The first references to insurance came in answers to questions asked by the court of two witnesses, including the witness Christopher. In summation, Hauptman accused Christopher of injecting insurance into the case so that the jury would grant recovery to the plaintiff. This accusation, appellant argues, prejudiced his case.

However, the fact that this accusation deals with the magic word insurance is of no particular significance. The injection of insurance into the case would appear to harm no one but the defendant.

The accusation against Christopher was a proper subject for argument in summation. Hauptman was seeking to counteract any harm done by Christopher's reference to insurance by exposing what he thought was the motive behind the reference. The jury heard Christopher's testimony and could judge for itself whether Christopher was unfairly accused. Indeed, it seems likely that Hauptman's clear reference to insurance aided the case more than the accusation harmed it. The prior reference was slight and tangential, and the court directed the jury to disregard it.

The objection to the admission of the police report is not well taken. The two copies of the police report, Exhibits B and I, concededly contain identical information, Exhibit B in Christopher's handwriting and Exhibit I mostly in his typing. Thus, if the admission of either was proper, the admission of the other was not prejudicial. The report presents hearsay problems at two levels, the reporter level and the declarant level, but neither of these problems required the exclusion of the report.

At the reporter level, it is established that Christopher prepared Exhibit B in his own handwriting and that he typed out Exhibit I himself. At one point Christopher stated: "Everything in this exhibit is my doing." Although it is unclear whether he was referring to Exhibit B or Exhibit I, it is of no importance since they contain identical information.

■ Exhibits B and I were identified by Christopher as the reports of the accident prepared by him on police forms, and which were kept in the police files. The court below found, and properly, that the records constituted admissible documents under 28 U.S.C.A. § 1732 and CPLR Rule 4518, the applicable codifications of the business record exception to the hearsay rule at the reporter level. See Hawkins v. Gorea Motor Express, Inc., 360 F.2d 933 (2 Cir. 1966) (per curiam); Salsberg v. Modern Transfer Co., 324 F.2d 737, 738 (2 Cir. 1963).

Moreover, the pretrial order stipulated that the police records of the accident "are authentic and may be offered in evidence." In addition, the gravamen of the hearsay objection is that the reporter or the declarant is not subject to cross

examination on the foundations for the statements in the report which are attributed to him. Since in this case Christopher was present and available for cross-examination as to any item on the report, there is no reason to exclude the police report for hearsay at the reporter level in any case. Central R. R. Co. of N. J. v. Jules S. Sottnek Co., 258 F.2d 85 (2 Cir. 1958). Indeed, Christopher was in fact examined regarding the basis for most of the statements which arguably harm the plaintiff's case, and in several instances, he acknowledged that the statements were not based on his own observation.

This brings us to the problems about the hearsay at the declarant level. Christopher stressed the fact that much of the information reflected in the report was garnered from Terry Nardin, the driver of the defendant's car. Particularly harmful to the plaintiff's case was the information in the report that the plaintiff was crawling on the highway and that plaintiff had been drinking and his ability was thus impaired.

■ The rule with respect to the admissibility of information in the police report which is garnered from other persons is somewhat unclear. Probably, however, the best rule is that if the original source (the declarant) is not under a duty to tell the truth, or if the statement of the declarant does not itself come under some established hearsay exception, e. g., *res gestae*, admission against interest, etc., then the police report containing that information is inadmissible. See Judge Tenney's discussion in Yates v. Bair Transport, Inc., 249 F. Supp. 681 (SDNY 1965).

■ However, even if the police report is inadmissible for the reasons given by Judge Tenney in *Yates*, its admission in this case was not reversible error. In the instant case, the declarants on whose statements the police report was based (Nardin, Kinraide, and Mrs. Nardin) were witnesses in the case and available for cross-examination on the subject of their statements to Christopher. Indeed, both the issue of plaintiff's inebriation and of his crawling on the highway were thoroughly litigated at the trial and the jury was fully aware of the limited observation on which the Nardins and Kinraide based their statements; the jury was also aware of Nardin's possible bias in the case as the driver of the defendant's car and a potential defendant himself at the time he made the statements to Christopher.

During the course of deliberations the jury sent the following note to the Court:

"May we have a ruling as to whether or not poor or improvident, impaired judgment is necessarily contributory negligence."

The Court decided that the best answer to that question was again to define negligence:

"Now I think that I can only answer that by repeating the definition of negligence.

It is either doing something which a reasonably prudent person under a set of circumstances would not do, or it is the failure to do something under a set of circumstances—given the set of circumstances—which a reasonably prudent person in those circumstances would do.

I think that is it. You may return to the jury room."

■ The appellant contends that it was reversible error for the court to refuse his request that the question be answered by a simple "No." We do not agree.

"No" could mean either that the jury may not have a ruling, or that impaired judgment was not necessarily contributory negligence, but it is clear that the appellant wanted the court to state the latter.

Even though the court could have correctly stated that impaired judgment is not necessarily contributory negligence, it was not error under the circumstances to give a general definition of negligence. In essence, the judge's definitional response meant "No, not necessarily. You must decide for yourself whether the impaired judgment here constituted con-

tributory negligence according to the following standard."

Appellant asserts that prejudicial error was committed when the court summarized its previous instructions and said that the jury must determine if some negligence of the defendant was a *substantial cause* of the injury to the plaintiff and if the plaintiff's negligence contributed *in any degree to the accident*.

The appellant concedes that the judge correctly stated earlier in his charge the rules concerning the interrelationship of negligence and contributory negligence but asserts that the later summarization confused the jury.

The court correctly charged that the *standards* of negligence by which the conduct is to be measured is the same for the plaintiff and the defendant, but the court never stated clearly that the standard of *causation* is the same.

Professor Prosser has addressed himself to this confusing area of the law.[1]

 The court, in its charge, expressed the idea that the jury should find for the defendant if the plaintiff's negligence contributed to the accident *in any*

*degree,* even though they may have found that the defendant's negligence caused the accident *in a substantial way*.

There are several factors which militate against reversing this case on the basis of this charge:

(1) There is language in the charge which instructs the jury that the plaintiff's negligence to bar recovery must have caused or brought about the accident.

(2) The objections of plaintiff's counsel to the charge, while flagging the general area of discontent, did not indicate the error with respect to causation with sufficient specificity to show the judge what was desired in order to correct the possibly misleading charge.

(3) The nature of the evidence was such that if the plaintiff was negligent as claimed, it is hardly conceivable that his negligence was not a substantial factor in causing his injuries.

While the charge might have been improved upon, as we have indicated, we are persuaded that the error was not such as to require a new trial.

The judgment is affirmed.

---

1. Prosser, Torts (3rd Ed.), p. 431. There is one rather curious but not infrequent aberration which makes an apparent distinction between negligence and contributory negligence. It is said by a number of courts [42] that the plaintiff is barred from recovery if his own negligence has contributed to his injury "in any degree, however slight." On the face of it this means that any insignificant contribution, such as the addition of a lighted match to a forest fire, would bar the action. In all probability this is nothing more than a confusion of words, which fails to distinguish slight negligence from slight contribution; and what is really meant is that the plaintiff's negligence can be a defense, no matter how slight his departure from ordinary standards of conduct. The intent, in other words, is to reject any idea of comparative negligence. If so, it is a mistake peculiarly likely to mislead the jury when an instruction is given in such terms. Most courts, when the distinction has been pointed out to them, have held that the rules as to causations [43] are the same for contributory negligence as for negligence,[44] and that the plaintiff is not

barred unless his negligence, of whatever degree, has been a substantial factor in causing his injury.[45]

42. Crane v. Neal, 1957, 389 Pa. 329, 132 A.2d 675; Ferris v. Patch, 1956, 119 Vt. 274, 126 A.2d 114, 63 A.L.R.2d 103; Atchison v. Reter. 1954, 245 Iowa 1005, 64 N.W.2d 923; Silva v. Waldie, 1938, 42 N.M. 514, 82 P.2d 282; Keck v. Pozorski, 1963, 135 Ind.App. 192, 191 N.E.2d 325.

43. See supra, p. 244.

44. Restatement of Torts, § 465.

45. Mack v. Precast Industries, Inc., 1963, 369 Mich. 439, 120 N.W.2d 225; Reep v. Greyhound Corp., 1960, 171 Ohio St. 199, 168 N.E.2d 494; Huey v. Milligan, 1961, 242 Ind. 93, 175 N.E.2d 698; Busch v. Lilly, 1960, 257 Minn. 343, 101 N.W.2d 199, 87 A.L.R.2d 1389; Smiroff v. McNerney, 1930, 112 Conn. 421, 152 A.2d 399; Farmer v. Central Mut. Ins. Co. of Chicago, 1937, 145 Kan. 951, 67 P. 2d 511; Devine v. Cook, 1955, 3 Utah 2d 134, 279 P.2d 1073.

Accord: Restatement Second, Torts, § 465, Comment (b).