Carl O. AKERMANIS, Plaintiff,

v.

SEA–LAND SERVICE, INC., Defendant.

No. 77 Civ. 6131–CSH.

United States District Court,
S. D. New York.

Oct. 14, 1981.

Markowitz & Glanstein, New York City, for plaintiff; Steven Thaler, New York City, of counsel.

Walker & Corsa, New York City, for defendant; Joseph T. Stearns, Sandra R. M. Gluck, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Carl Akermanis, a licensed marine engineer, brought this action against his former employer, defendant Sea-Land Service, Inc., to recover for damages allegedly caused by an accidental injury suffered on board defendant's vessel LOS ANGELES on June 4, 1977. The complaint stated causes of action for unseaworthiness, and for negligence under the Jones Act, 46 U.S.C. § 688. The Court dismissed the unseaworthiness claim at the conclusion of plaintiff's case. Defendant's motion to dismiss the negligence cause of action was denied, defendant offered evidence, and that cause of action was submitted to the jury in the form of a special verdict. The jury found that defendant's negligence was a proximate cause of plaintiff's accident, and assessed damages of $150,000 for past pain and suffering, $100,000 for future pain and suffering, $160,000 for past lost earnings, and $118,000 for future lost earnings. The damages consequently totalled $528,-000. Finally, the jury found that the contributory negligence of plaintiff contributed to the accident in the amount of 4%.

The Court entered judgment in plaintiff's favor for $489,514.61. This amount reflected the 4% reduction for contributory

negligence, and a 2% discount on future damages, the parties having offered no proof on the relevant economic issues. *Doca v. Marina Mercante Nicaraguense*, 634 F.2d 30, 40 (2d Cir. 1980). The judgment bore interest at 6% per annum.

Defendant now moves pursuant to Rules 50 and 59, F.R.Civ.P., for an order granting defendant judgment n. o. v., or in the alternative a new trial, or in further alternative a remittitur. Plaintiff cross-moves to amend the judgment so as to provide for interest at 9%.

## I.

Plaintiff was 59 years old at the time of the alleged accident. He had been going to sea since 1936. After service in the United States Navy, he obtained his first marine engineer's license in 1946, and, until the date of his accident, sailed continuously in the Merchant Marine since that time. He obtained a chief engineer's license in 1957. At the pertinent time, however, plaintiff was sailing on board defendant's vessel LOS ANGELES as a third assistant day engineer, having joined the vessel in that capacity on March 31, 1977.

The theory of plaintiff's case was that, on the morning of June 4, 1977, he was assigned to do burning and "finishing" work on deck. The LOS ANGELES was then on a voyage from Persian Gulf ports through the Mediterranean, bound for Rotterdam. On the date of the accident, she had passed through the Strait of Gibraltar, and was navigating in the North Atlantic. Plaintiff's work consisted of using a torch to burn off the top of an iron pedestal, containing a deteriorated support bracket for a turnbuckle, which was in turn used to secure one of the movable cranes of the vessel while at sea. Plaintiff contended that the place in which he was working was unreasonably unsafe because the working of the vessel in the seas had wetted the decks with spray, rendering the deck area slippery. (Plaintiff, in his testimony, was not specific about the physical cause of the accident about to be related, but his contention

through counsel, articulated throughout the case and advanced with the assistance of expert testimony at the trial, was that wind-blown spray from waves had rendered the deck area hazardous for work.) Plaintiff was working on top of hatch covers near the port edge of the coaming, between the number 9 and 10 hatches. He testified that as he was burning the top of the pedestal with his torch, he lost his balance, struck his head on the pedestal, and that then his head was jerked backwards as he fell. Plaintiff alleged a severe and permanent injury to his cervical spine, resulting in his inability to work again as a merchant seaman.

Defendant's theories of the case were (1) no accident had occurred, rather plaintiff was asserting a pretext to recover damages before retiring; and (2) whatever symptoms plaintiff had suffered, or was suffering from, resulted from other physical conditions and maladies, not related to the alleged accident.

Plaintiff testified at the trial. The chief officer and chief engineer of the vessel testified by deposition. In addition to these lay fact witnesses, there was an extensive amount of medical evidence. The medical evidence took the form of deposition testimony by plaintiff's post-accident treating physician, an orthopedist; hospital records relating to a number of hospitalizations of plaintiff and consequent treatment, both prior and subsequent to the accident; and the usual medical expert witnesses, retained by the parties to give evidence at the trial.

The opposing papers on the present motion rehearse at length the parties' contentions, factual, medical, and legal. In passing upon defendant's motion for judgment n. o. v. under Rule 50(b), I must view the evidence in the light most favorable to plaintiff. The standard is different on a motion for a new trial under Rule 59; a new trial motion may be granted even if there is substantial evidence to support the jury's verdict, and the trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the

verdict winner. *Bevevino v. M.S. Saydjari*, 574 F.2d 676, 677, 683–84 (2d Cir. 1978). However, even within the Rule 59 context, the moving party must satisfy the trial judge that the verdict was contrary to the weight of the evidence; and the Second Circuit in *Bevevino* specifically approved the standard set forth by a leading commentator that the trial judge should "abstain from interfering with the verdict unless it is quite clear that the jury had reached a seriously erroneous result." *Id.* at 684, quoting *6A Moore's Federal Practice*, ¶ 59.08[5], at 59–160–59–161 (1973).

■ Implicit in this standard is the rule that "a trial judge should not act merely as a '13th juror' and set a verdict aside simply because he would have reached a different result had he been the trier of fact." *Borras v. Sea Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir. 1978). It has also been said that "courts have long been, and should be especially reluctant to overturn a jury finding of negligence in an F.E.L.A. case." *Morgan v. Consolidated Rail Corp.*, 509 F.Supp. 281, 285 (S.D.N.Y.1980), and cases cited. This last observation is pertinent because Jones Act cases are governed by F.E.L.A. principles.

■ Viewed in the light of these standards, defendant is not entitled to judgment n. o. v., or, with the exception of the contributory negligence issue discussed under Point II *infra*, to a new trial. The accident either occurred or it did not. Defendant argued that the evidence showed plaintiff did not report the incident, and that he had attained the level of full retirement benefits, from which defendant asked the jury to infer that plaintiff had invented the accident in order to finance a more comfortable retirement. The jury was entitled in law to draw that inference; but it was equally entitled to believe the plaintiff's account of what happened to him, as it clearly did. I do not regard the jury's conclusion as seriously erroneous. Having observed plaintiff's demeanor and listened to his testimony, I do not believe that he fabricated the accident.

On the question of defendant's negligence, plaintiff's expert witness testified that the prevailing conditions of wave, wind, and the vessel's motion through the seas resulted in spray on the deck which rendered the area unsafe for the designated work. Plaintiff testified that the chief engineer directed him to perform the work. The chief officer's duties included supervision of work on deck with a view to safety. There is no basis, under either rule, to disturb the jury's finding that defendant's negligence contributed to the accident.

Finally, the jury was entitled to conclude, from the mass of medical evidence, that the accident caused an injury to plaintiff's cervical spine, permanent in nature, which, when superimposed upon whatever prior conditions plaintiff suffered from, constituted the cause of a permanent disability to work as a marine engineer. The Public Health Service treating physician, Dr. Miller, during the course of a lengthy deposition, gave such testimony (Dep. Tr. 87, 88, 95, 96); a comparable opinion was expressed by plaintiff's trial expert, Dr. Golub, who attached particular significance to a reversal of the upper cervical curve which he detected in the x-rays.

There was, of course, contrary evidence from the two medical expert witnesses defendant called at trial. The jury could have accepted those opinions; it could also have drawn certain of the inferences which defendant's counsel asked it to draw from plaintiff's voluminous medical history. But again, the jury elected not to do so; and it is a necessary function of lay jurors to choose between conflicting medical opinion. In addition, the jury was entitled to consider the fact, stressed by plaintiff's counsel in argument, that notwithstanding the previously existing conditions stressed by defendant, plaintiff had worked without significant interruption at sea for many years prior to the accident in suit. Defendant's riposte, as previously noted, was that plaintiff had decided it was time to retire, and wished to augment his pension. But the jury was also entitled to credit plaintiff's

testimony—as did I—when, in responding to that suggestion by defendant's counsel on cross-examination, he stated in substance that he loved the sea, it was his home, he knew no other, he had not intended to retire, and badly missed going to sea.

These considerations are fatal to defendant's motion for judgment n. o. v. under Rule 50, on the questions of liability and causation discussed. Within the context of defendant's motion for a new trial under Rule 59, I could disturb the jury's findings on these issues only if I acted as an impermissible "13th juror," which I decline to do, because I am not persuaded that they were "seriously erroneous."

## II.

The question of substance that arises, on this aspect of the motion, relates to the jury's finding of 4% contributory negligence. As noted *supra*, there is no basis for disturbing the jury's findings that the area in which plaintiff was working was unsafe by reason of spray on the deck, and that defendant's supervising officers, who directed plaintiff to perform this work, knew or should have known of the hazard. But defendant argued that plaintiff, a man of many years' experience at sea, and the holder of a chief engineer's license, was equally able to appreciate any danger, and that he could have, by an alternate course of conduct, avoided the danger.

To sustain a theory of contributory negligence, defendant was required to demonstrate something more than plaintiff's proceeding in the face of an apparent hazard. A theory of negligence, so limited, is the legal equivalent of the defense of assumption of the risk, which is not available in cases of this nature. *Rivera v. Farrell Lines, Inc.*, 474 F.2d 255, 257–58 (2d Cir. 1973). It is necessary for the defendant to demonstrate "an act of negligence other than [plaintiff's] knowledge of the dangerous condition," such as a failure to take an alternate route which would have avoided the hazard. *Id.* at 258. That is to say, "the

defense of contributory negligence requires evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition." *Tolar v. Kinsman Marine Transit Co.*, 618 F.2d 1193 (6th Cir. 1980), citing *Rivera, supra.* "A seaman may not be denied recovery because he proceeds in an unsafe area of the ship or uses an unsafe appliance in absence of a showing that there was a safe alternative available to him." *Tolar* at 1195.

In the case at bar, defendant perceives the requisite safe alternative in plaintiff's testimony that the project of replacing the on-deck fittings had been going on for a period of a week, ten days, possibly longer than that; that plaintiff had been preparing some of the replacement fittings while the vessel was in the Mediterranean; and that the weather in the Mediterranean "was real beautiful then." It further appears from the evidence that plaintiff, while given a number of projects as assistant day engineer, exercised a considerable degree of personal control as to which project he would work upon at what time. It is further established from the evidence that the accident occurred on a Saturday, which was an overtime day, and that plaintiff was not required to work on that day at all, unless he wished to accrue overtime. From these facts, essentially undisputed, defendant argues that plaintiff could have performed this work while the vessel was still sailing in the beautiful weather of the relatively sheltered Mediterranean; or, the vessel having progressed into the North Atlantic, he could have deferred the work until a different time if the weather conditions at a given moment created a hazardous condition. This theory finds arguable support in the following testimony given by the plaintiff on cross-examination:

"Q. This project of cutting off and replacing these pedestal supports was an ongoing thing, correct?"

"A. Yes."

"Q. It had been going on for a period of time, perhaps a week, ten days, maybe more?"

"A. Right."

"Q. You were doing that when it was convenient and you were doing other things when it was convenient and you were doing the routine things one after the other as you chose, correct?"

"MR. THALER: I object to form."

"THE COURT: Overruled."

"MR. THALER: Okay."

"Q. As you chose?"

"A. Like, working those pedestals, when it was good weather, I could cut all those gadgets off, get ready to weld these new parts over it, because they had already made three or four of them. I don't know who made them. I could put those on in good weather and when it was bad weather I could—they didn't take long to make it. You don't have to work for days. I could make four, five in one day or maybe six, maybe all eight." Tr. 28–29.

Against this record, the Court charged the jury, without exception, on the issue of contributory negligence in pertinent part as follows:

"In this case, in order to establish that the plaintiff was negligent, the defendant must prove an act of negligence other than the plaintiff's knowledge of a dangerous condition in the area of his work. That is because under the law, the plaintiff did not assume the risk of his employment. That is, he does not under the law assume the risk of a negligently created condition.

"But the plaintiff was under a duty to make reasonable use of his own senses, in order to avoid injury to himself. In that regard, you must consider the defendant's argument that Mr. Akermanis could have arranged his work schedule so as to complete this particular burning and welding project while the vessel was in calmer waters, earlier in the voyage, before passing through the straits of Gibraltar into the North Atlantic."

The jury, so instructed and in the light of this evidence, answered in the affirmative the following question on the special verdict:

"5. Has defendant proved, by a fair preponderance of the credible evidence, that there was any contributory fault of plaintiff Carl Akermanis, which proximately caused his accident?"

And, having answered that question in the affirmative, the jury assessed the percentage of contribution of the plaintiff's own fault to the accident at 4%, leaving the remaining 96% to fall upon defendant.

If the jury had concluded that plaintiff was free of contributory negligence, a question of some difficulty might have arisen as to whether that conclusion was not only erroneous, but "seriously" so. However, the jury by its verdict has voiced its conclusion that, in fact, fault of the plaintiff contributed to his accident. In the circumstances of this case, I have no difficulty at all in concluding that the minimal percentage assigned to that fault constitutes clear and serious error.

Defendant argues that a finding of 4% contributory negligence is, in the circumstances, "unsupportable." Main brief at 16. Defendant cites no case for this proposition, or to indicate what a proper allocation should be. But I am persuaded, on the basis of my own research, that the general proposition is sound, and that a significant increase in the degree of contributory negligence is required to prevent a miscarriage of justice. The subjects of "assumption of risk, contributory negligence, and division of damages" are treated in West's Federal Practice Digest under "Seamen," key number 29(4). Examination of the headnotes indicates that, in cases where judge or jury have found contributory negligence on the part of the plaintiff, the allocated percentages fall for the most part between 20% and 50%. Of course, each case turns upon its own circumstances; but this trend of decision reflects a general awareness that if a seaman's negligence contributed to his shipboard injury, it did so to a significant degree.

While I find no precedent for so minimal an allocation in a case where a seaman's negligence has contributed to his own injury, I do not hold that a 4% allocation for contributory negligence can never be appropriate. But I do conclude that, in the circumstances of this case, it cannot be. As defendant accurately states in its brief at 16, this is a case "in which plaintiff was working voluntarily on overtime and in which he admitted that he exercised discretion as to when and how he would perform this routine task." No compulsion to do this work at this time appears. Plaintiff could have reasonably foreseen that it would be safer to do burning and finishing work on an exposed deck in the Mediterranean rather than the North Atlantic. In somewhat comparable circumstances, judges sitting without juries have found 50% contributory negligence factors. See, e. g., Nygaard v. Peter Pan Seafoods, Inc., 508 F.Supp. 151, 154 (W.D.Wash.1981), per Senior District Judge Beeks; Haughton v. Blackships, Inc., 334 F.Supp. 317 (S.D.Tex. 1971), rev'd on other grounds, 462 F.2d 788 (5th Cir. 1972).

■ In the case at bar, the jury clearly indicated its view that a considerably greater share of fault should be allocated to the defendant shipowner. In reaching that conclusion, the jury presumably had in mind plaintiff's testimony that the chief engineer instructed him to work on deck on the day in question, testimony which permitted plaintiff's counsel to argue in summation that, under the adverse weather conditions prevailing, and notwithstanding plaintiff's option to do something else that morning, "the assignment should never have been given" by the chief engineer, and that the chief officer should not have permitted plaintiff to continue in his work. Tr. 68. While I regard the jury's precise assessed percentages as impermissible, it is entitled to place the greater share of the fault upon defendant. My view on this aspect of the case is that, in the totality of circumstances, a contributory negligence allocation of only 4% is seriously erroneous; and that defendant is entitled to a new trial on liability

issues, unless plaintiff agrees to a remittitur of the damages awarded, based upon a contributory negligence factor of 25%. The procedure that will be followed in the event of a new trial is discussed under Point VI infra.

### III.

Defendant contends that the jury's awards of damages are excessive. Consistent with preferred practice, cf. Gretchen v. United States, 618 F.2d 177, 180–81 (2d Cir. 1980), the jury completed a special verdict calculating separate amounts for past and future loss of earnings, and past and future pain and suffering. Defendant challenges each award.

In passing upon a motion challenging a jury's verdict as excessive, "the trial judge is not called upon to say whether the amount is higher than he personally would have awarded," Dagnello v. Long Island Railroad, 289 F.2d 797, 806 (2d Cir. 1961), citing with approval Delaney v. New York Cent. R. Co., 68 F.Supp. 70 (S.D.N.Y.1946), and Lopoczyk v. Chester A. Poling, Inc., 60 F.Supp. 839 (S.D.N.Y.), aff'd, 152 F.2d 457 (2d Cir. 1945). In Delaney, this Court said:

"Even though I might disagree with the amount of the verdict, I have no right to substitute my mind for that of the jury. A verdict will not be set aside simply because it is excessive in the mind of the Court, but only when it is so grossly excessive as to shock the Court's sense of justice and the impropriety of allowing it to stand is manifest." 68 F.Supp. at 73.

Lopoczyk, supra, expands on the theme in these words:

"It is familiar learning that the court should not set aside a verdict on the ground that it is excessive unless it is so high as to shock the conscience. This rule is to be applied even where there is some feeling on the part of the trial court that a smaller verdict would have been more appropriate ... The principle is that if the court should set aside the jury's verdict in the absence of a showing of caprice, passion or prejudice, it would be usurping the jury's function ... The

power to set aside should be cautiously used because where pain and suffering and permanent injury are involved there can be no exact yardstick and the jury's determination should stand unless it is clearly unreasonable." 60 F.Supp. at 840 (citations omitted).

At the appellate court level, the standard of review is essentially the same. See, e. g., *Mileski v. Long Island Railroad*, 499 F.2d 1169, 1173 (2d Cir. 1974) ("... we cannot say that this award was so grossly excessive or shocking to the conscience that it would be a 'denial of justice to let it stand,'" citing *Dagnello, supra,* and *Grunenthal v. Long Island Railroad*, 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968)); *Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir. 1979); *Zarcone v. Perry*, 572 F.2d 52, 56–57 (2d Cir. 1978); *Fernandez v. Chios Shipping Co., Ltd.*, 542 F.2d 145, 155 (2d Cir. 1976) ("... although the jury's verdict for the longshoreman was generous, it was not so excessive as to shock the court's conscience"); *Vaccaro v. Alcoa Steamship Co.*, 405 F.2d 1133, 1139 (2d Cir. 1968).

█ The jury's award of lost earnings will stand if there is evidence in the record to support it. *Grunenthal v. Long Island Railroad, supra,* 393 U.S. at 160, 89 S.Ct. at 333; *Williamson v. Compania Anonima Venezolana de Navigacion*, 446 F.2d 1339, 1342 (2d Cir. 1971). An award for pain and suffering, necessarily depending upon less precise measures of calculation, will not be disturbed unless so grossly excessive as to shock the conscience and to constitute a denial of justice. *Mileski, supra,* and other cases cited.

█ Judged by these standards of review, the present jury's awards are invulnerable to challenge. The amounts for past and future lost earnings find adequate support in the record. As noted under Point I, *supra,* I decline to disturb the jury's findings that, as the result of the defendant's

negligence, plaintiff suffered permanent injury which terminated a career at sea he would otherwise have continued. Plaintiff became disabled in June, 1977, at age 59. He called as a witness Daniel Colon, a union official, who testified without contradiction that the mandatory retirement age for merchant marine engineers was 70, and that berths had been and remained available on American flag vessels. Because of industrial retooling, plaintiff would probably have had to upgrade his license from steam to diesel in order to secure continued employment; but he testified that it had been his intention to do so, and the jury was entitled to believe him. The jury awarded plaintiff $160,000 for past lost earnings (1977–1981), and $118,000 for future lost earnings (post-1981), for a total of $278,000. The amounts plaintiff would have earned under the union contract were established by Colon's testimony. Taking into account the increases in wages called for by the union contract, and reasonably predictable overtime based upon plaintiff's past performance, plaintiff would have earned $255,336.62 during the period 1977 through 1983 under a steam license, and $280,870.28 if he had obtained a diesel license. Thus the total amount awarded by the jury is supported by the evidence of what he would have earned, had he continued to sail through age 66. The jury evidently declined to award future lost earnings beyond that age although, as noted, plaintiff would not have been required to retire until he was 70. The awards for lost earnings, being supported by evidence in the record, will not be disturbed.[1]

█ The jury also awarded plaintiff $150,000 for past pain and suffering, and $100,000 for future pain and suffering, making a total of $250,000 under this general heading. The total award is undoubtedly generous. I might well have awarded a lower figure. Neither of these factors, under the controlling authorities, is of legal

1. Defendant argues that a series of post-accident hospitalizations, unrelated to the accident, would necessarily have prevented plaintiff from earning wages in an amount equal to the jury's award. But the hospitalizations were of rela-

tively brief duration, and, in view of the undisputed evidence concerning the amount of shoreside vacation plaintiff received each year under the union contract, would not necessarily have interrupted his earnings.

significance. The case concerns jury findings of permanent and debilitating back pain, which put an end to the career of a man who loved the sea. The award for pain and suffering is not of a magnitude to shock the Court's conscience, or amount to a denial of justice.

In short, I deny the motion for a new trial or remittitur based upon the asserted excessiveness of the damages awarded.[2]

### IV.

As an alternative basis for relief, defendant contends that improprieties of plaintiff's counsel during summation inflamed the passion and prejudice of the jury, thereby depriving defendant of a fair trial.

While defendant's counsel is generally critical of his adversary, only two comments made by plaintiff's counsel during summation require discussion. The first involves what defendant regards as an unfair imputation of perjury to defendant's witnesses. The issue arises in this manner. Chief Officer Moulton of the LOS ANGELES testified by deposition that, in a conversation with Chief Engineer Carver of that vessel on April 1, 1977, the day after plaintiff joined the vessel for the voyage in question, Carver told Moulton that "whenever he asked Mr. Akermanis to perform a task requiring responsibility, Mr. Akermanis tended to become ill."[3] Defendant relied upon this testimony in urging that a wave of dizziness which plaintiff testified he suffered several days after the accident was not causally related to the accident. In order to rebut this theory, plaintiff's counsel relied upon the following testimony given by Chief Engineer Carver at his deposition:

"Q Did you know Mr. Akermanis before he joined the vessel?"

"A I attended school with him in Baltimore, Maryland, electrical school at the union school."

"Q When was that about?"

"A I have no idea now. It was some time in the past."

Page 14:

"Q Did he ever sail on any of your ships?"

"A No."

In the light of that testimony, plaintiff's counsel argued to the jury that Moulton's account of what Carver told him was a fabrication, Carver having testified that plaintiff had not sailed "on any of [his] ships."

Defendant attacks this argument as unfair because, in fact, plaintiff had sailed on the LOS ANGELES with Chief Engineer Carver during the period August through December, 1976. That is established by individual overtime sheets which defendant produced, *for the first time*, in support of the present motion. Long before trial, plaintiff had requested from defendant all of his work records, documents which rested within defendant's possession and control. Defendant forwarded a number of employment and overtime records to plaintiff's counsel; however, the overtime records for the period August-December, 1976 evidencing plaintiff's presence on board the LOS ANGELES, were not included. Defend-

---

**2.** Defendant complains that the jury adopted the figures suggested by plaintiff's counsel in summation. As for lost earnings, counsel based his calculations on the record evidence, which as noted *supra* was sufficient to sustain them. On pain and suffering, counsel said: "We ask you to consider a sum of $150,000 for pain and suffering to the present, and we ask you to consider $100,000 for pain and suffering for the future." While the jury gave favorable consideration to those figures, counsel's remarks did not rise to the level of expressed personal opinion that the Second Circuit criticized in *Mileski, supra,* at 1172–1173, and thus

did not necessitate a curative instruction. Cf. *Mileski* at 1174. Nor did defendant object to this use of specific figures, or ask for a special instruction. In these circumstances, the adoption by the jury of figures suggested by counsel in summation furnishes no basis for a new trial or remittitur.

**3.** Carver's out-of-court declaration, offered to prove the truth of the matter asserted, would appear to be inadmissible hearsay, Rules 801(c), 802, F.R.Evid., but plaintiff raised no objection.

ant's counsel, in his affidavit in support of the present motion, says:

"A search of our file indicates that we were not in possession of plaintiff's records for that period, which were either misplaced or inadvertently not forwarded to us by defendant. Our firm then appears to have inadvertently forwarded the incomplete records to Mr. Thaler as part of our production of documents." Stearns affidavit at ¶ 32, p. 29.

It is apparent, therefore, that defendant failed to comply with a legitimate demand for production of highly pertinent documents. Defendant now seeks to parlay its own failure into a ground for obtaining a new trial. One can almost admire the nerve of the effort, but it is devoid of merit. Defendant argues:

"There are two questions presented: (1) did the attorney for plaintiff know of the fact that, indeed, plaintiff and Carver had sailed in August to December 1976 as respectively Chief Engineer and Third Assistant Day Engineer aboard S/S LOS ANGELES and; (2), if the attorney should claim that he was not aware of this fact, what would excuse his failure to inquire of plaintiff before making such a central allegation of perjury in an effort to tip the balance in his favor in argument before the jury." Stearns affidavit at ¶ 30, pp. 28–29.

Counsel's peroration appears in the last paragraph of his affidavit:

". . . the new trial issue of misconduct as a result of the imputation of perjury might be seen as turning upon a single factor: the attorney's failure to ask plaintiff during direct examination whether or not he had sailed with Carver in 1976. A truthful answer to this question would have deprived plaintiff of any basis for the assertions of perjury in summation. A false answer would have, at least, alerted the defendant to the existence of some relevance to the question, and might have resulted in conclusive refutation, with the same effect. Instead, the attorney for plaintiff was con-

tent with what was at best, ambiguity and withheld the argument until summation, and this was deliberate." Stearns affidavit, ¶ 43, p. 40.

Plaintiff's counsel avers, in an answering affidavit, that "plaintiff had no recollection of serving with [Carver] one way or the other." Thaler affidavit at ¶ 115, p. 55. I accept that representation as plausible in the circumstances. Precisely for that reason, plaintiff's counsel explored the subject during Carver's deposition, with the answer quoted above. Plaintiff's counsel further explored the question by demanding the plaintiff's work records, with the results also described above. In these circumstances, plaintiff's counsel can hardly be criticized for asking the jury to draw the inference that Chief Officer Moulton was embellishing his conversation with Carver. These events do not reveal an improper failure on the part of plaintiff's counsel to inquire; they reveal an improper failure on the part of defendant to respond to discovery. I accept the inadvertence of that failure, but defendant is hardly in a position to turn it to its advantage. It is permissible for counsel, in summation, to argue that the opposing party's witnesses were "less than candid and impartial" if, in the circumstances, the argument is "not without support in the record." *Juaire v. Nardin,* 395 F.2d 373, 377 (2d Cir. 1968). That is the situation in the case at bar.

The second issue requiring discussion relates to what counsel for both parties said in their summations about the presence, or absence, of spray upon the deck at the time of the alleged accident. Plaintiff called an expert witness, Captain Adams, to testify that, as the result of the wind and wave conditions and speed of the vessel, spray would have been present on the deck in the area where plaintiff was working. Plaintiff, in a supplement to the pre-trial order, had identified Adams as an expert witness it might call. At the conclusion of Adams' testimony, counsel for defendant advised the Court that he expected to call an expert witness "on the sole question of the possibility or likelihood of the existence of spray on

the deck." Counsel stated further that he expected his expert to say that "the vessel was making a wake at the time, cutting through the water, and that there is no possibility whatsoever of such spray" from the waves existing at the time reaching the work area.

Plaintiff objected to the proffered expert testimony, on the grounds that defendant had failed to give notice of its intention to call such an expert, either in response to plaintiff's specific interrogatories on the point, or, as required, in the pre-trial order or a supplement thereto. The Court sustained plaintiff's objections, finding entirely unpersuasive (for reasons appearing in the trial transcript and not here repeated) the argument of defendant's counsel that he had been taken by surprise by Adams' testimony about spray on deck.

In the light of the Court's ruling that defendant was precluded from calling a "spray" expert, defendant's counsel raised the question of whether plaintiff's counsel would be permitted, in summation, to comment upon defendant's failure to call an expert witness to rebut the claim of spray on deck. The Court responded:

> "I think that if Mr. Thaler undertook to say that in summation, I would be bound to advise the jury of the dialogue that we have just had, the application made on behalf of the defendant, and my ruling in respect to it."

Against that background, defendant's counsel, in giving the first summing up to the jury, argued as follows with respect to the testimony of plaintiff's expert, Captain Adams:

> "He also indicated the spray, if any, coming aboard the ship would be coming at a point where the seas met the ship's bow. He then later said that any place alongside the starboard side some spray might be thrown up as a result of waves or the sea lapping against the ship's side and might somehow come on the deck.
>
> "He forgot to mention the fact that *when a ship goes through the water it makes a wake. The wake is the effect of the ship pushing the water out of the way, and as the water is imparted it moved away from the ship's side, not towards it.*
>
> "This might lead you to believe, and I suggest it's correct that in fact if any spray was coming aboard this ship as a result of encountering waves as high as 5 or 6 feet it would have been in the immediate vicinity of the starboard bow, a distance of some 400 feet or more, most likely 500 feet from where Mr. Akermanis was working.
>
> "And in addition, you remember the testimony of Captain Adams to the effect that ship was, in breadth, that is from side to side, some point port to starboard, some 78 feet wide.
>
> "That is correct, according to my calculations based on Lloyd's Registry, it was perhaps 10 feet. Another witness said 7 or 8 feet inboard from the starboard rail which means that he was a distance of no less than 68 feet on the longer or leeward side away from the rudder at the time of the occurrence.
>
> "*With all these factors considered* and the additional fact that he was standing above the deck a distance of three or four feet, he was given the picture of the sea provided by the scale photographs. It's possible [sic] for the spray to have been on the pedestal and the place where plaintiff says it was." (Tr. 6–8) (emphasis added) (The word "possible" as appearing in the transcript should obviously be "impossible.").

This argument led plaintiff's counsel, in his summation, to say the following:

> "Now, with regard to the spray, you recall the testimony that the water itself with these forces will have a spray on the water, a slight spray. Then the motion of the ship through the water, the spray is going to come up over and that was the undisputed testimony, notwithstanding what you have heard in argument here. There has been no testimony which disputes or contests that fact." (Tr. 51).

The following thereupon occurred:

> "MR. STEARNS: In view of the Court's ruling on this point, this is an absolutely improper argument to make."

"THE COURT: I will say to the jury at this time that as a result of the ruling on a point of the law, which you are not aware of and which need not concern you, at the time the defendant decided to put on an expert witness to give evidence on the point that spray could not have come on the deck, as a result of a ruling of law which need not concern you, I declined to let that testimony in. I think you should know that in view of what counsel has just presented to you in argument." (Tr. 51).

■ Following summations, and in the absence of the jury, the Court expressed concern that the remarks of plaintiff's counsel transgressed the spirit, if not the precise wording, of the Court's ruling when defendant was precluded from calling a "spray" expert. Upon further consideration, however, I accept plaintiff's argument that the challenged statement of his counsel constituted fair comment upon what defendant's counsel had argued in his summation. Having failed to abide by the discovery rules and the requirements of the pre-trial order, defendant was precluded from calling an expert witness to describe how the vessel's wake would prevent spray from the waves affecting the work area. Defendant's counsel, in summation, sought to remedy the lack by supplying the testimony himself. In those circumstances, plaintiff's counsel was entitled, in fairness, to argue to the jury that the presence of spray was established by "the undisputed testimony, notwithstanding what you have heard in argument here," and that there was "no testimony which disputes or contests that fact."

It is, of course, well settled that "[i]mproper or intemperate argument by counsel in summation may necessitate a new trial where it tends to arouse undue passion or prejudice on the part of the jury, thereby depriving the opposite party of a fair trial." *Mileski, supra,* at 1171, and cases there cited. The courts should not hesitate to grant relief where counsel indulges in "outrageous argument," *San Antonio v. Timko,* 368 F.2d 983 (2d Cir. 1966), or when counsel "repeatedly went beyond the bounds of propriety," *Koufakis v. Carvel,* 425 F.2d 892, 901 (2d Cir. 1970). The Supreme Court has mandated a new trial where the record reveals "a bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury," *New York Central R.R. Co. v. Johnson,* 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706 (1929). But no such improprieties were committed in the case at bar. On the contrary, the comments which defendant particularly criticizes were justified by the circumstances. Complaints of prejudicial and unfair arguments to the jury are not sufficient to obtain a new trial where the behavior of counsel is not outrageous, and the jury's verdict is justified, as in the case at bar, by the evidence in the record. *Fortunato v. Ford Motor Co.,* 464 F.2d 962, 971 (2d Cir. 1972).

### V.

The final question raised by the parties is the rate of interest to be awarded on the judgment from the date of judgment [4] until the date of satisfaction of the judgment. Plaintiff contends that New York law, which imposes an interest rate of 9% per annum [5], governs the issue. Plaintiff de-

---

4. In the case at bar, the judgment, which was signed on July 20, 1981, states that interest was to commence on July 15, 1981, five days prior to entry of judgment. This provision does not reflect the Court's determination that prejudgment interest is appropriate in this case, a decision defendant contends is precluded in a Jones Act case. Rather, it reflects an agreement between the parties to the effect that defendant would pay interest on the judgment from July 15, the original settlement date of the judgment, in exchange for an extension of time until July 20 within which to submit its own proposed judgment. Thus, defendant's cross-motion for an order amending the date interest was to commence is denied as moot.

5. N.Y.C.P.L.R. § 5004, as amended effective June 25, 1981. Plaintiff suggests that, if the Court should hold that New York law governs the question of the rate of interest, the Court is not bound by § 5004, but instead may look to

rives support for his position from 28 U.S.C. § 1961, which provides:

"Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law."

The Court's original judgment provided for 6% interest. Plaintiff moves to amend to 9%.

Although the case at bar is a "civil case" and thus apparently falls within the express terms of § 1961, defendant contends that, since the cause of action arises under the Jones Act, a federal statute, the question of the rate of post-judgment interest is governed solely by federal law. Accordingly, defendant would defer to the discretion of the trial judge, discretion defendant feels was properly exercised when the Court signed a judgment providing for interest at the rate of 6% per annum.

 The language of § 1961 is mandatory; it directs that interest *"shall be"* calculated at the rate allowed by state law. Its terms do not permit of the exercise of judicial discretion in its application. *Cf. Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 312, 68 S.Ct. 1039, 1043, 92 L.Ed. 1403 (1948) (Rutledge, J., dissenting) (construing predecessor statute to § 1961). Nor does § 1961 differentiate between cases arising under this Court's diversity jurisdiction and those arising under its federal question jurisdiction; the statute simply applies to all "civil cases." As the Second Circuit noted in *Kotsopoulos v. Asturia Shipping Co., S. A.*, 467 F.2d 91, 95 (2d Cir. 1972),

"the universal application of Section 1961 to all types of claims makes for logical uniformity. Once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. See Restatement of Judgments § 47 (1942). A single rule should govern interest on any such debt, the nature of the original claim having become irrelevant under the doctrine of merger."

Although *Kotsopoulos* was brought under the general maritime law, its principles have since been applied to Jones Act cases. *Reinertsen v. George W. Rogers Construction Corp.*, 403 F.Supp. 1263 (S.D.N.Y.1975); *see Barrios v. Louisiana Constr. Materials Co.*, 465 F.2d 1157, 1168 (5th Cir. 1972).

Defendant cites *Briggs v. Pennsylvania R. Co.*, 164 F.2d 21 (2d Cir. 1947), *aff'd*, 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948), as support for the proposition that federal rather than state law governs the rate of interest in cases arising under a federal statute. In *Briggs*, which involved a cause of action under the F.E.L.A., there were two judgments entered—one after the original trial and the other after remand by the Court of Appeals. The question faced by the Second Circuit was from *which* of the judgments interest should run, an issue resolved in favor of the latter date by applying federal law. *Briggs* is relevant to the case at bar, however, not because the Second Circuit relied on federal law to interpret the term "the date of the judgment," as that phrase was used in 28 U.S.C. § 811, the predecessor statute to § 1961, but because the Second Circuit, and the Supreme Court on appeal, in reaching that issue necessarily assumed the applicability of 28 U.S.C. § 811 to F.E.L.A., and thus Jones Act, cases. Interpretation of § 1961 is not an issue in this case; the language in § 1961 concerning the rate of interest is

the higher interest rates set in N.Y.G.O.L. 5–501. The purpose of § 5004, however, "is to set a fixed interest rate on judgments, independent of the usury provisions of General Obligations Law § 5–501, except as otherwise provided by statute." Law Revision Comm'n Note to L.1972, c. 358, § 1. The New York courts, to whom the Court must look should it find New York law applicable, have applied § 5004 to the exclusion of GOL § 5–501. *See* Siegal, Supplementary Practice Commentaries to N.Y.C.P. L.R. § 5004 (McKinney's Supp. Pamphlet 1964–80). Accordingly, this Court is not free to award the higher rates of G.O.L. § 5–501, but is instead limited by the 9% rate set forth in CPLR § 5004.

clear and unambiguous. The issue is the statute's applicability to a Jones Act case, and on that *Briggs* is unequivocal.

■ From the foregoing, it is clear that § 1961, and through it New York state law, controls the question of the appropriate rate of interest, a rate set by N.Y.C.P.L.R. § 5004 at 9% per annum. Moreover, it should be noted that, even if the question of the rate of interest were left to the Court's discretion, considerations of public policy would warrant raising the rate of interest to 9%. In today's economy, it is not unusual for one to earn interest on one's money at a double-digit rate. Accordingly, a defendant motivated only by self-interest would be economically well advised to defer as long as possible the payment of a judgment accruing interest at a rate of 6%. Such a disincentive to ending litigation instigated for the purpose of making a plaintiff whole should not be encouraged.[6]

### VI.

For the reasons stated under Point II *supra*, defendant is entitled to a new trial on the question of contributory negligence, unless plaintiff agrees to an appropriate remittitur. The remaining question is the dimension of the new trial, if plaintiff does not agree to the remittitur.

Rule 59(a) provides that a new trial "may be granted on all or part of the issues..." Thus the rule provides for partial new trials in appropriate circumstances. "Perhaps the most common example is the grant of a new trial limited to damages when liability has been properly determined, but there also may be a new trial on liability with the prior determination of damages allowed to stand." Wright and Miller, *Federal Practice and Procedure*, § 2814, pp. 93–95 (1973). The granting of a partial new trial is subject to a *caveat* that "it may not be properly resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice..." *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500–01, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931).

Contributory negligence is a liability issue. As the Fifth Circuit observed in *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 143 n.4 (5th Cir. 1975), "[a]lthough contributory

---

**6.** One additional point on the form of the judgment should be noted, although not directly raised on these motions. Defendant took the position in the charge conference, after both sides had rested, that it was entitled to an instruction that the claim for lost earnings should be calculated on the basis of net wages after taxes. Alternatively, defendant contended that the Court should judicially notice the tax rates and perform the deduction itself. After the requested instruction was denied, defendant submitted a counter-judgment in an amount reduced to reflect an accountant's calculation of the tax impact. The Court declined to sign that judgment.

Defendant relied upon *Norfolk and Western Railway v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), which the Second Circuit recognized in *Doca, supra*, at 35 may cast doubt upon that court's earlier rule that in an FELA case no deduction would be made for taxes. See *McWeeney v. New York, New Haven & Hartford R. R. Co.*, 282 F.2d 34 (2d Cir.) (en banc), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). In *Liepelt* plaintiff's expert testified that decedent, had he lived, would have earned wages totalling $302,-000. Defendant offered to prove, through an expert actuary, that income taxes would have reduced the pecuniary loss to a net figure of $138,327. Defendant also requested an instruction to the jury that the award of damages would not be subject to income taxation. The jury awarded plaintiff $775,000. The Court held that the proffered evidence should have been received, and the requested instruction given.

In the case at bar, the parties were directed to submit their requests to charge prior to trial. Defendant asked that the jury be instructed that any award to plaintiff would not constitute taxable income. That charge was given. Defendant did not ask for an instruction that the jury should *reduce* its award to reflect net, after-tax figures until the proof was closed; and, unlike the defendant in *Liepelt*, offered no expert testimony on the quantum of the tax impact. In these circumstances, defendant was not entitled to the requested charge. There was no evidence before the lay jury upon which to base a calculation, and the belated timing of the request deprived plaintiff of the opportunity to meet the issue with research on the law or with evidence of his own. Nor was the Court prepared to reduce the judgment itself on the basis of defendant's post-trial calculation. The factual issues, had they been timely raised, were for the jury, and plaintiff cannot be deprived of his right to jury trial upon them.

negligence is often referred to in these cases as a factor 'in mitigation of damages', *e. g., Pope & Talbot v. Hawn*, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953), it is conceptually a factor in assessing the relative *liabilities* of the parties." (emphasis in original). Thus, where the trial court fails to properly instruct the jury on contributory negligence, but the jury's calculation of damages is invulnerable to attack, the new trial will be limited to liability issues, with the verdict on damages to stand in the event defendant is again found liable. *Dazenko v. James Hunter Machine Co.*, 393 F.2d 287, 291 (7th Cir. 1968). Cf. *Landry, supra*, which presented the converse situation:

> "Because contributory negligence is a factor for determining the comparative liability between the parties, whether under the Jones Act or general maritime law, *Pope & Talbot v. Hawn*, supra, and because we see no reason to disturb the jury's finding on liability, II supra, any award in a new trial solely on the issue of damages must be reduced by 20% by the Court." 511 F.2d 143 at n.4.

In the case at bar, there is no basis to disturb the jury's award of damages. Consequently, if plaintiff does not accept a remittitur based upon a 25% contributory negligence factor, defendant will be entitled to a new trial on liability only, at which defendant may relitigate the issues of its own negligence and that of the plaintiff. *Dazenko, supra.*

For the foregoing reasons, it is ORDERED as follows:

1. Plaintiff's motion to amend the judgment is granted. Plaintiff is directed to file and serve, within fourteen (14) days of the date of this Order, an amended judgment providing for interest at the rate of 9% per annum from July 15, 1981 until paid.

2. Defendant's motion for judgment in its favor n. o. v. is denied.

3. Defendant's motion for a new trial on damages issues is denied.

4. Defendant's motion for a new trial on liability issues is granted, and a new trial

ordered, unless within twenty (20) days of the date of entry of the judgment called for by paragraph 1 of this Order, plaintiff files with the Clerk of the Court a remittitur of all damages in excess of that amount resulting from application of a 25% reduction for contributory negligence.