In the Matter of the Arbitration of Certain Controversies Between CARTE BLANCHE (SINGAPORE) PTE. LTD., Petitioner,

v.

CARTE BLANCHE INTERNATIONAL, LTD., Respondent.

No. 88 CIV. 0662 (PKL).

United States District Court,
S.D. New York.

April 8, 1988.

Orans, Elsen & Lupert, New York City, for petitioner; Sheldon H. Elsen, Clement L. Colucci, of counsel.

Kay, Collyer & Boose, New York City, for respondent; Robert Kay, Mark C. Morril, Barry A. Brust, of counsel.

## OPINION & ORDER

LEISURE, District Judge:

Petitioner Carte Blanche (Singapore) PTE. Ltd. ("CBS") seeks confirmation of an arbitration award in its favor against respondent Carte Blanche International ("CBI"). CBI has cross-moved to vacate the arbitration award, or, in the alternative, to modify the award.

## FACTUAL BACKGROUND

CBS is a corporation organized and existing under the laws of Singapore and having its principal place of business in Singapore. CBI is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of New York.

On August 11, 1980, CBS and CBI entered into an agreement that made CBS a franchisee of CBI to market and service Carte Blanche credit cards in Malaysia, Singapore and Brunei (the "Franchise Agreement"). By early 1981, however, it became clear that CBI's international franchise business was no longer viable, and in June of 1981, CBI determined to close down its international franchise business as soon as possible. The relationship between CBI and CBS proceeded smoothly through 1984, despite the fact that CBS was the sole international franchisee of CBI after 1981.

The controversy giving rise to the instant arbitration arose in 1984, when CBI discovered two corporate actions previously taken by CBS that CBI claims resulted in placing the franchise in the control of a company other than CBS. On or about September 11, 1983, the shareholders of CBS sold 100% of the shares of CBS to a newly-created company controlled by them called Global Equities PTE, Ltd. ("Global"). In December of 1984, 50% of the shares of Global were transferred to the MBf Holdings Berhad Group of Companies ("MBf"). CBI claimed that these transfers violated several provisions of the Franchise Agreement, including paragraph 7.10, which provided in pertinent part that

> [t]he license and rights granted hereunder shall not be transferable, or the subject of a further license or sublicense by Franchisee; any attempted assignment of the Agreement or the license and rights granted thereunder in violation hereof shall be null and void and shall constitute a material breach and an event of default.

Carte Blanche International Ltd. Franchise Agreement, annexed as Exhibit A to the Petition and Affidavit of Sheldon H. Elsen,

Esq. (hereinafter "Elsen Aff."), sworn to on January 29, 1988, at 29. CBI placed CBS on formal notice of default under the Franchise Agreement. CBS contended that such transfers did not breach the Franchise Agreement, or were at most technical violations, because they were only transfers of shares, not assignments of interests.

In October of 1985, CBI and CBS filed essentially contemporaneous demands for arbitration with the International Chamber of Commerce ("ICC").[1] CBS claimed, among other things, that "CBI has engaged in a reduction of essential services...." CBS Demand for Arbitration, annexed as Exhibit I to the Petition and Affidavit of Mark C. Morril, Esq. (hereinafter "Morril Aff."), sworn to on February 8, 1988, at 3. CBI claimed, *inter alia*, that the Franchise Agreement was subject to termination because of CBS's material breach by violating paragraph 7.10 of the Franchise Agreement. CBI Demand for Arbitration, annexed as Exhibit J to Morril Aff., at 2–4.

On or about May 30, 1986, CBS filed an Amended Demand for Arbitration. Morril Aff., Exhibit K. By this amendment, CBS sought specific damages in the amount of $4,945,000 for the value of stock, $697,000 for reimbursement of certain loans, and loss of earnings on the foregoing amounts, estimated to be in excess of $1,000,000. *Id.* at 10.

On April 29, 1986, the ICC duly confirmed the appointments of William Piel, Esq., Professor Hans Smit, and Theodore Sorenson, Esq., as arbitrators for the arbitration to take place in New York City. The panel held hearings for eleven days during June, July and August of 1986 in the Southern District of New York.

On February 18, 1987, a majority of the panel consisting of Mr. Piel and Professor Smit found for CBS on all claims and handed down an Interim Award, from which Mr. Sorensen dissented. Interim Award (hereinafter "IA"), annexed as Exhibit C to Elsen Aff. The majority held that "[d]amages should therefore be awarded to CBS for the value of a promised business opportunity destroyed or gravely impaired...." *Id.* at 11. Mr. Sorenson's dissent expressed his view that CBI did not breach the Franchise Agreement, that the agreement terminated by its own terms in March of 1985, and that no damages could be awarded for the period after March 31, 1985.

After the interim award, CBS sought leave to amend its pleading and the Terms of Reference to assert a claim for $3.5 million in consequential damages. CBI expressed its objection to such an amendment, and no formal amendment was ever made. Chairman Piel suggested that CBS could proceed with a claim for consequential damages without amending its pleadings or the Terms of Reference. Morril Aff. at ¶ 38. Nine days of further hearings were conducted on the issue of an appropriate remedy. In these hearings, CBS sought a total of $16,745,994 in damages, costs and fees. CBI argued that CBS failed to mitigate damages and urged that the interim award be withdrawn based on CBS's concealment of its plan to convert the CBS business to a MasterCard business.

On January 25, 1988, the arbitrators made a written Final Award. Final Award (hereinafter "FA"), annexed as Exhibit D

---

1. Paragraph 7.09 of the Franchise Agreement provided in pertinent part:

   All disputes between CBI and Franchisee, except any dispute as to any unsettled charges on any cardmember charges, arising in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with said Rules. The arbitration panel shall apply the law stipulated in paragraph 7.12 hereunder. CBI and Franchisee shall each appoint one arbitrator and the two arbitrators so nominated shall designate a third arbitrator acceptable to both parties, failing which the ICC Court shall designate the third arbitrator. The arbitral award shall be final and binding on the parties in accordance with said Rules and shall be entitled to recognition and enforcement by virtue of comity, treaty, convention, or other applicable law. Judgment may be had on the arbitral award in any domestic or foreign court of competent jurisdiction. Elsen Aff., Exhibit A, at 29.

to Elsen Aff. CBS was awarded damages and costs in the following amounts:

| | | |
|---|---|---:|
| fair and reasonable value of CBS, including reasonable prospects for future profitability: | | $4,300,000.00 |
| consequential damages (operating losses and expenses): | | 5,116,477.00 |
| costs: | | 312,161.20 |
| Subtotal | | 9,728,638.20 |
| Less: | credit for CBI's transfer to CBS of rights in cardholder accounts: | 735,000.00 |
| TOTAL: | | 8,993,638.20 |

CBS was also awarded interest and injunctive relief. The award was delivered[2] to the parties by Chairman Piel on January 28, 1988, and this action was commenced on February 1, 1988, by the filing of the Petition and Affidavit of Sheldon Elsen, Esq. On February 1, 1988, the Court ordered respondent to show cause on February 9, 1988, why an order should not be made confirming the award of the arbitrators.

Shortly after the filing of the action, respondent served notices of deposition on Professor Smit and Louis A. Craco, Esq., who had originally been designated as CBS's party arbitrator under paragraph 7.09 of the Franchise Agreement. On February 4, 1988, the Court ordered the depositions so noticed to be stayed, and ordered respondent to show cause on February 9, 1988, why an order should not be entered quashing the notices of deposition. On February 8, 1988, the Court received a letter from Mr. Morril stating that the notices of deposition and accompanying subpoenae had been withdrawn.

On February 9, 1988, the parties appeared before the Court, and, after some discussion of the issues, the Court instructed petitioner to submit answering papers to respondent's cross-motion. The Court now decides that the award made by the arbitrators should be confirmed for the reasons stated below.

## DISCUSSION

Petitioner seeks confirmation of the arbitration award pursuant to section 9 of the Federal Arbitration Act.[3] Because the Franchise Agreement encompasses a transaction involving commerce within the meaning of section 1 of the Federal Arbitration Act, and because the arbitration took place in the Southern District of New York, this Court has proper jurisdiction, and venue lies in this District.

### I. Grounds for Vacatur or Modification.

As the Second Circuit has often noted, the scope of a district court's review of an arbitration award is limited. *See, e.g., Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987); *Sperry International Trade, Inc. v. Government of Israel,* 689 F.2d 301, 304 (2d Cir.1982). The court must grant confirmation of an award unless a statutory basis for vacatur or modification of the award is present, or because of the nonstatutory ground of " 'manifest disregard' of the law." *Id.* at 305.

Respondent contends that the award must be vacated pursuant to section 10 of the Act,[4] or, in the alternative, modified

---

**2.** The initial delivery of the award was made by Chairman Piel on January 28, 1988. The effective date of the Final Award is addressed below. *See infra* at 958.

**3.** Section 9 provides in pertinent part:
If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United

States court in and for the district within which such award was made.
9 U.S.C. § 9 (1982).

**4.** Section 10 of the Federal Arbitration Act provides in its entirety:
In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
(a) Where the award was procured by corruption, fraud, or undue means.
(b) Where there was evident partiality or corruption in the arbitrators, or either of them.
(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hear-

pursuant to section 11.[5] Respondent also contends that the award must be set aside because of the arbitrators' manifest disregard of applicable law. The Court notes at the outset that respondents have demonstrated no statutory basis for modification of the award pursuant to section 11. The only reasons proferred for vacatur are actions in excess of the arbitrators' power pursuant to section 10(d), and the nonstatutory basis of manifest disregard of law. The Court will address each of respondent's arguments for vacating the award.

Respondent contends that the arbitrators failed to apply California law and the express provisions of the Franchise Agreement, and that such failure requires vacatur of the award. Specifically, respondent maintains that vacatur is required by the arbitrators' failure to follow applicable law or by actions exceeding their powers with regard to: (1) the notice and consent provisions of paragraph 7.11 of the Franchise Agreement in connection with the Global and MBf transactions; (2) the arbitrators' refusal to apply the explicit provisions of the Franchise Agreement; (3) the arbitrators' use of self-imposed standards of good faith and fair dealing that were contrary to the Franchise Agreement's provision for strict compliance; (4) the arbitrators' failure to enforce California law on the avoidability of damages; (5) the operation of a travel business under the Carte Blanche mark; (6) the arbitrators' failure to grant CBI a full credit for the cardholder accounts; and (7) the award of consequential damages in excess of the arbitrators' powers.

Many of respondent's contentions summarized above assert manifest disregard of applicable law as the basis for vacatur. The Second Circuit has recently clarified the standard by which district courts are to decide whether to vacate an award for manifest disregard of the law. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933–34 (2d Cir.1986). The language of that opinion in most instructive:

"Manifest disregard of the law" by arbitrators is a judicially-created ground for vacating their arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan,* 346 U.S. 427, 436–37 [74 S.Ct. 182, 187–88, 98 L.Ed. 168] (1953). It is not to be found in the federal arbitration law. 9 U.S.C. § 10. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties.

---

ing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10 (1982).

**5.** Section 11 of the Act provides:
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11 (1982).

Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.

*Id.* (citations omitted). Applying this standard to the facts of this case, the Court concludes that the award cannot be vacated for manifest disregard of law.

■ *1. Notice and Consent Provisions.* CBI first maintains that, with regard to the Global and MBf transactions, the notice and consent provisions of paragraph 7.11 of the Franchise Agreement were breached under California law, made applicable to the arbitration by paragraph 7.12 of the Franchise Agreement. CBI reasons that paragraph 7.10 provides that CBS' rights under the Franchise Agreement are nonassignable, but that paragraph 7.11(b) goes on to provide:

> If Franchisee desires or is required to sell its business, CBI or a related affiliate of CBI shall have first option and right of first refusal to acquire Franchisee's stock or assets, name and proprietary rights and goodwill. CBI shall be notified in each instance by registered mail of any offer whenever such option and right might ripen and shall have a period of forty-five (45) days in which to meet the bona fide written offer of any third party or to exercise such option at a mutually agreeable price based on fair market value calculations of CBI, Franchisee, and their respective accountants.
>
> \* \* \* \* \* \*
>
> If CBI fails to exercise its right of first refusal and/or right of first option within the specified period of forty-five days or within any extended period to which the

parties may agree, then Franchisee shall be free to dispose of its business to any third party: provided, however, that this Agreement and the rights and licenses granted hereunder shall remain nonassignable by Franchisee (absent CBI's consent) as stipulated in Section 7.10 hereof, in the case of such sale or transfer of Franchisee's business to any third party.

CBI contends that the arbitrators failed or refused "to apply clear principles of California law understood by them and plainly applicable to the facts at hand." Respondent's Memo at 17.

CBI asserts that California law is clear that the "failure of a party to seek consent to a proposed transaction, when required to do so, operates as an *absolute preclusion* to later inquiry as to whether such consent, if sought, could reasonably have been withheld." Respondent's Memo at 18 (citing *Thrifty Oil Co. v. Batarse,* 174 Cal.App.3d 770, 220 Cal.Rptr. 285 (2d Dist.1985). But the arbitration panel found that there was no requirement of notice or consent under the circumstances of this case under California law because "prohibition of, or the requirement of consent for, assignment of an agreement does not affect the freedom of the shareholders of a corporate party to the agreement to transfer their shares." IA, at 13. From the decision that no assignment took place, it follows that no notice or consent need have been given. Respondent's argumetn is therefore unavailing.[6]

Moreover, the panel found only that "even if CBI had a right to have its consent requested for the MBf transaction, the failure to request it would be at most a technical breach, and not a material breach excusing Franchisor's performance. This is because in no event would we hold that the Franchisor could arbitrarily refuse consent." IA, at 27. But the panel did not

---

**6.** CBS consulted with the California office of Baker & McKenzie, and was informed that under California law, CBS did not have to get the consent of CBI to transfer 50% of its shares to MBf. The mere fact a client has secured advice from experienced counsel that the client may safely proceed in its desired course of action

does not always mean that the advice given is correct. Such advice does, however, temper to some degree the claim by CBI that the law in this area is so "well defined, explicit and clearly applicable," *see Bobker, supra,* 808 F.2d at 934, that the actions of the arbitrators constituted manifest disregard of law.

rely on this reasoning to which CBI takes objection because it found that CBS did not have to get CBI's consent. It is therefore irrelevant that the panel might have been wrong, as a matter of California law, as to whether the Franchisor could arbitrarily refuse consent, if such consent was required.

The Supreme Court's decision in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), stands for the proposition that an arbitrator is not required to explain the rationale for his award, and that any ambiguity in the award must be resolved, if possible, in a manner supporting confirmation of the award. In this case, the award is susceptible of two possible interpretations. The first, and obvious one, is that the arbitrators concluded that no consent was needed, and whatever they added about the possibility of unreasonable withholding of consent was mere dictum, unnecessary to their ruling. The second interpretation is that they found consent to be required, but excused the failure of consent because, under the circumstances, it could not reasonably have been withheld. It seems apparent to the Court that the arbitrators actually relied on the former ground, but even were it not apparent, the Court would have to accept the interpretation supporting the award. *Enterprise Wheel & Car*, 363 U.S. at 598, 80 S.Ct. at 1361. Indeed, respondent properly notes that an "award will be upheld if the court perceives a 'colorable justification' or 'rational basis'" for the award. Respondent's Memo at 21. Because a rational basis for the award exists, the award cannot be vacated for the first reason proffered by respondent.

■ *2. Refusal to Apply Explicit Provisions of the Franchise Agreement.* CBI next contends that the arbitrators' refusal to apply the explicit provisions of the Franchise Agreement warrants vacatur of the award. In support of this argument, they cite this Court's decision in *Local 814, International Brotherhood of Teamsters v. Sotheby's, Inc.*, 665 F.Supp. 1089 (S.D.N.Y. 1987). In that case, this Court found that

the arbitrator, one Eisenberg, made an award that contradicted his own findings of fact. "The express language of the Award clearly reveals Eisenberg's abuse of his authority under the Agreement. Although *Enterprise* permits courts to uphold an award where there exist plausible inferences by which the award can be validated, here, Eisenberg's own words militate against the drawing of such inferences; Eisenberg's own Award explicitly contradicts Eisenberg's own findings of facts." *Id.* at 1094–95.

CBI asserts that the award of the arbitrators here disregarded findings of breach, in violation of the Franchise Agreement. This contention is clearly without merit. The panel did not disregard findings of breach; rather it found that no breach had occurred. In this case, it was possible to conclude that there was no breach, and this Court, in its limited reviewing capacity, does not question that finding. This is wholly unlike the situation in *Sotheby's*, where the arbitrator's explicit findings were contradicted by his award. In this case, the award and findings are consistent.

*3. Standards of Good Faith and Fair Dealing.* CBI also contends that the arbitrators disregarded the terms of the Franchise Agreement insofar as it calls for strict compliance. This argument, like the two made above, however, is premised on the notion that CBS breached the Franchise Agreement in not providing notice to CBI of the sales of stock to Global and MBf. CBI again relies on *Sotheby's*, but again that decision is inapposite. Counsel for CBI are precisely right when they state "[i]n the instant case the arbitrators likewise were not entitled to engraft their notions of what the agreement should have said once they found the facts that triggered what the agreement actually said." Respondent's Memo at 24. In this case, however, the arbitrators simply did not find facts that triggered what the agreement actually said.

■ *4. Avoidability of Damages.* CBI next maintains that the arbitrators failed to enforce California law on avoidability of

damages. Under California law, damages are not recoverable to the extent that the injured party could have avoided them by reasonable efforts. *Sackett v. Spindler,* 248 Cal.App.2d 220, 239, 56 Cal.Rptr. 435, 447 (1st Dist.1967). But the arbitrators explicitly pointed out five problems that confronted CBS in deciding how to conduct its credit card business that made mitigation of damages impracticable:

> (i) uncertainty as to the outcome of this proceeding, (ii) CBI's assertion that CBS was obliged not to destroy or impair the residual value of assets belonging ultimately to CBI (Franchise Agreement, Sections 6.03, 6.04), (iii) some deterioration of general economic conditions in the areas of its operations, (iv) the need to avoid jeopardizing the collections of outstanding cardmember receivables, and (v) after the rendering of the Interim Award, the necessity of taking reasonable steps toward the winding down and ultimate termination of its business.

FA, at 4. The question of whether a party acted reasonably to mitigate damages is one of fact. *Sacket v. Spindler,* 248 Cal. App.2d at 239, 56 Cal.Rptr. at 447; *Ortiz v. Bank of America National Trust and Savings Association,* 824 F.2d 692, 695 (9th Cir.1987). Thus, although there may have been some evidence that CBS could have avoided damages, the arbitrators obviously credited the testimony that stressed the difficult position in which CBS found itself, and concluded that damages could not have been mitigated by reasonable efforts.

■ *5. Operation of a Travel Business.* CBI contends that the panel's decision that CBS's operation of a travel business under the Carte Blanche mark did not breach the Franchise Agreement exceeded the panel's authority. CBS used the Carte Blanche name in connection with the operation of a travel business and, in advertising, in conjunction with the MBf name. The arbitrators found that "[t]here is no proof, and no contention, that either of these actions did any harm to the prestige or value of the [Carte Blanche] mark." IA at 32. But the arbitrators went on to conclude:

> Certainly consent should have been requested. Had it been requested, it is doubtful it could reasonably have been refused. In any case there is no showing that the oversight did harm; it could readily be cured; and proof of harm absent, it is not so material as to excuse the Franchisor's performance of its obligations.

*Id.*

CBI points to paragraph 7.10 of the Franchise Agreement in support of its contention that consent was required in order for CBS to use the Carte Blanche name or mark. But paragraph 7.10 provides that "[t]he license and rights granted hereunder shall not be transferrable, or the subject of a further license or sublicense by Franchisee; any attempted assignment of ... the license and rights granted thereunder in violation hereof ... shall constitute a material breach and an event of default." The arbitrators did not find that the use of the Carte Blanche mark constituted a sublicense or subfranchise. If there was no sublicense, the operation of paragraph 7.10 was not triggered.

Although the arbitrators did not specifically address this point, it appears that the use of the Carte Blanche mark in a business other than the credit card business is covered by paragraph 2.03(b) of the Franchise Agreement, which provides:

> CBI reserves for itself, its subsidiaries or its parent, the right to use the licensed service marks in the Licensed Territory in support of the credit card business conducted by Carte Blanche and CBI in the U.S.A. and internationally and in connection with businesses or activities other than the credit card business.

Use of the Carte Blanche name or mark in connection with a business other than the credit card business without the consent of CBI is not listed among the "Events of Default" in section 6.02 of the Franchise Agreement. Thus, although the arbitrators found that consent should have been requested, they did not find that failure to obtain such consent was a material breach or an event of default under the Franchise

Agreement. As such, this is not a case of inconsistency between the findings of the arbitrators and the requirements of the Franchise Agreement.

The arbitrators' ruling on this issue was admittedly ambiguous. But as the Supreme Court has noted, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *Enterprise Wheel and Car*, 363 U.S. at 598, 80 S.Ct. at 1361. Because a rational basis for the arbitrators' actions exists, the Court declines to vacate the award on this basis.

■ *6. Credit for Cardholder Accounts.* Both CBS and CBI claimed that the cardholder accounts of CBS had substantial value because of the cash flow that they anticipated the cards would generate. Experts for both parties submitted affidavits to the arbitration panel estimating the discounted present value of the cards at $160 per active and creditworthy card. The arbitrators then decided that CBI was entitled to the accounts pursuant to paragraph 6.03 of the Franchise Agreement, and urged CBI to transfer those accounts to CBS for a credit to the account of CBI in the arbitration. The parties agreed to this, and CBI's Amended Offer to CBS included the following provision:

> 4. The value of the rights thus conveyed by CBI shall be a credit to the account of CBI in this arbitration in such U.S. dollar amount as the parties may hereafter agree or, in the absence of their agreement, as the Arbitral Panel may hereafter determine to be the fair average value of a CBS/CBM cardholder account as of June 2, 1987 multiplied by the number of active and creditworthy CBS and CBM cardholder accounts at that date.

CBI's Amended Offer to CBS, annexed as Exhibit X to Morril Aff. After this offer, CBS submitted a revised estimate that was significantly lower. The parties failed to agree on the value of the accounts, and the arbitrators fixed the total amount at $735,-000, or approximately $38 per card. FA, at 3–4.

CBI now asserts that the arbitrators "obtained limited authority from the parties to implement [paragraph 6.03] of the Franchise Agreement by permitting the conversion of the accounts to MBf's Mastercard business in exchange for payment to CBI of the fair and reasonable value of the accounts." Respondent's Memo at 26. But CBI offers no evidence that the arbitrators possessed only limited authority with respect to this question. According to the terms of CBI's offer, if the parties failed to agree, the panel was to determine the fair average value of the cardholder accounts. No limitation on the authority of the panel appears in CBI's offer or elsewhere. CBI has adduced no evidence that the panel's ruling as to the value of $38 per card was in excess of their authority or in manifest disregard of applicable law. The award therefore cannot be vacated on that basis.

*7. Consequential Damages.* Finally, CBI contends that the award of $5.1 million in consequential damages exceeded the power of the arbitrators. CBI asserts that the original pleading in the case sought total damages of approximately $6.7 million, and that the original pleading was not amended to allow so large a claim for consequential damages. After the Interim Award was handed down, CBS sought leave to amend its pleading and the Terms of Reference to assert a claim for $3.5 million in consequential damages. CBS ultimately sought a total of $16,745,994 in damages. Chairman Piel allowed CBS to proceed with its claim for consequential damages without a formal amendment to the pleadings or Terms of Referencce, over CBI's objection. Morril Aff. ¶ 38. CBI maintains that this was beyond the power of the arbitrators, and in violation of ICC Rules of Arbitration, and that vacatur of the award is therefore required.

CBI has submitted the Declaration of Yves Derains ("Derains"), in support of its petition to vacate the award.[7] Declaration

---

**7.** Derains' qualifications, as listed in the Decla-   ration, are as follows:

of Yves Derains, dated February 15, 1988 (hereinafter "Derains Decl."). Derains declared that he had examined the arbitration demands made by the parties, CBS's amended demand for arbitration, the Interim Award, the Final Award, portions of CBS and CBI's motion papers, and the Terms of Reference. Derains Decl., at ¶ 4. On the basis of the information provided to him, Derains concluded that at least four. ICC Rules of Arbitration had been violated.

Specifically, Derains maintains that Articles 6, 16, 21 and 23 of the ICC Rules of Arbitration were violated. Article 16 limits new claims to those made within the Terms of Reference.[8] According to Derains, a claim presented after the execution of the Terms of Reference may be permitted by the arbitrators only if it is within the original Terms of Reference. Otherwise, a rider must be signed by the parties and communicated to the Court. Derains asserts that such a rider was essential in this case for the claim for consequential damages to be before the arbitrators. *Id.* at ¶ 11.

Derains pointed out that even if a claim is not new, it may require an amendment to the Terms of Reference if a substantial increase in the amount of damages sought under a particular claim is asserted. Derains stated that CBS's claim for consequential damages required a rider to the Terms of Reference because it was an entirely new claim, and, even if not new, was for significantly more than any prior claims made. *Id.* at ¶ 12. If one party did not consent to the rider, the ICC Court would not allow the claim to be heard, but would require the party pressing the claim to commence a separate arbitration. *Id.* Because Derains concluded that the arbitrators were not authorized to permit new claims in this case, "the provisions of Article 16 of the ICC Rules have been grossly violated." *Id.* at ¶ 14.

Derains asserts that Article 6 of the ICC Rules was also violated.[9] This Rule requires that a copy of all pleadings be submitted to the ICC Secretariat. The reason for this rule, according to Derains, is to allow the ICC Court to scrutinize the award with complete knowledge of the claims of the parties. Because the parties did not file a new claim or amend the Terms of Reference, the parties did not have to send a copy of the new claim to the ICC Court. Derains asserts that this violates Article 6 because the claim for consequential damages was, in effect, a new claim. *Id.* at ¶ 15.

The combination of the violations of Articles 6 and 16, according to Derains, results in the violation of Rule 21, one of the major rules of the ICC Court.[10] Rule 21 requires

---

For more than 15 years I have devoted the majority of my professional time to the field of international arbitration. From 1973 to 1977, I served as Secretary of the Court of Arbitration of the International Chamber of Commerce. From February 1977 to December 1981, I was the Secretary General of the same institution. The Secretary General of the ICC Court of Arbitration second in rank only to the President of that organization and is in charge of all day to day affairs of the institution.
Derains Decl. at ¶ 2. Derains has also published numerous articles on arbitration. *See* Derains Decl., Exhibit A.

**8.** Article 16 of the ICC Rules of Arbitration provides:
The parties may make new claims or counterclaims before the arbitrator on condition that these remain within the limits fixed by the Terms of Reference provided for in Article 13 or that they are specified in a rider to that document, signed by the parties and communicated to the Court.
Derains Decl., ¶ 10.

**9.** Article 6(1) of the ICC Rules of Arbitration states:
All pleadings and written statements submitted by the parties, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat.
Derains Decl., ¶ 15.

**10.** Article 21 of the ICC Rules of Arbitration provides:
Before signing an award, whether partial or definitive, the arbitrator shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the award and, without affecting the arbitrator's liberty of decision, may also draw his attention to points of substance. No award shall be signed until it has been approved by the Court as to its form.

the ICC Court to approve all final awards of damages. Derains notes that the failure to file a new pleading or amend the Terms of Reference "reduced the possibility that the ICC Court of Arbitration would discover that a claim which was not within the limit of the Terms of Reference had been permitted. It is as much the case as the final award does not use the words 'consequential damages.'" *Id.* Derains claims that this resulted in a gross violation of ICC Rules.

Derains maintains that Article 23 of the the ICC Rules was also violated.[11] That rule requires that the ICC Court be paid its fee before the award is released. Because the ICC fee is based on the amount in dispute, Derains asserts that Article 23 has been violated because the ICC did not know the extent of the damages and therefore did not know how much the fees would be.

Counsel for CBS respond that the Derains Declaration should be disregarded by the Court. First, they claim that CBI's failure to complain to the ICC Court after the March 19 ruling by the arbitrators that no new pleading or amendment to the Terms of Reference was required effectively waived any objection of the type they assert here. Letter from Sheldon H. Elsen, Esq., to the Court, dated February 18, 1988 (hereinafter "Elsen Feb. 18 Letter"), at 3–4. Counsel for CBI asserts, however, that "a party in arbitration cannot be required to bring each ruling to which he has objected to the body administering the arbitration, on an interlocutory basis, without knowing if he will suffer actual harm from the ruling." Letter from Mark C. Morril, Esq., to the Court, dated February 22, 1988 (hereinafter "Morril Feb. 22 Letter"), at 2. In support of its argument, CBI cites *Swift Independent Packing Co. v. District Union Local One,* 575 F.Supp. 912 (N.D.N.Y. 1983), for the proposition that a party need only make a proper objection to preserve an objection for subsequent judicial review.

CBS maintains, however, that *Swift* is inapposite because in that case there was no sponsoring body to whom the losing party could have objected. Letter from Sheldon Elsen, Esq., to the Court, dated February 23, 1988, at 1. In this case, the ICC Court reviewed the award, and, CBS maintains, CBI could have objected to that body. Failure to object to the ICC, according to CBS, waived any objection CBI might have. *Id.*

■ In *Swift,* no objection was made at all until the arbitration was completed and confirmation sought in court. In the instant case, timely objection was made to the arbitrators. In *La Societe Nationale Pour La Recherche v. Shaheen Natural Resources,* 585 F.Supp. 57 (S.D.N.Y.1983), *aff'd,* 733 F.2d 260 (2d Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984), the Honorable Kevin Thomas Duffy, District Judge of this Court, found that failure to make an objection to the arbitration panel waived the objection. The panel in that case was a three-member International Chamber of Commerce panel, as in the instant case. Judge Duffy did not address the issue of whether, had such objection been made to the panel, the objection would have to be repeated to the ICC Court in order to be preserved. Although Judge Duffy did not reach that issue, his opinion contemplates that objection to the panel would have been sufficient to preserve the objection. This Court is unwilling to require the parties in an arbitration to repeat each and every objection, no matter how minor, to the sponsoring body. *Swift* requires only that the objection be made before the arbitration is concluded and confirmation of the award sought in court.

CBS raises other reasons for rejecting the Derains Declaration. CBS maintains that to the extent that ICC rules are relevant here in this proceeding, they should have been taken into account by the arbitrators and the ICC Court, not raised by an expert on arbitration law in this proceed-

---

**11.** Article 23(1) of the ICC Rules of Arbitration provides:

Once an award has been made, the Secretariat shall notify to the parties the text signed by the arbitrator; provided always that the costs of the arbitration have been fully paid to the International Chamber of Commerce by the parties or by one of them.

Derains Decl. at ¶ 16.

ing. Elsen Feb. 18 Letter, at 4. Counsel for CBI replied that "[e]xpert testimony is, of course, the normal way for evidence as to interpretation of foreign law to be brought before a court." Morril Feb. 22 Letter, at 2. Rule 44.1 of the Federal Rules of Civil Procedure provides for the determination of foreign law:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1. The language of the rule and the Advisory Committee Note make it clear that the rule applies to determination of the law of a foreign *country.* No foreign country is involved here. Indeed, the Court finds that although the governing body of the ICC Court is located in Paris, and that it has its own procedural rules, this Court is able to understand those rules as well as the rules of other arbitration associations located in this country. Thus, it is not clear that this Court should consider the declaration submitted by Derains as expert testimony. As most of the arguments in the Derains Declaration are incorporated in the Reply Memorandum of CBI, the Court will consider those arguments as it would in deciding an issue of law.

Counsel for CBS contends that if the losing party in an arbitration proceeding could raise issues on procedural rulings of the arbitrators, proceedings to confirm arbitration awards would lose their summary nature, and courts would be plunged into an examination of the entire record of the arbitration proceeding to determine whether all procedural rules were complied with. Elsen Feb. 18 Letter, at 4. A major purpose of the Federal Arbitration Act is to avoid delay and unnecessary expense to the parties, *see, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985), and the delay that would result from reviewing procedural rulings of the arbitrators would be substantial.

■ But to hold that a district court may not review any procedural rulings of the arbitration panel, as counsel for CBS suggests, Elsen 2/18/88 Letter, at 4, would result in judicial abdication in reviewing arbitration awards. Although the Arbitration Act requires restraint in reviewing arbitration awards, it does not call for total abdication of reviewing power. *See Newark Morning Ledger Co. v. Newark Typographical Union Local 103,* 797 F.2d 162, 165–66 n. 3 (3d Cir.1986) (quoting Summers, *Judicial Review of Labor Arbitration,* 2 Buffalo L.Rev. 1, 21–22, 24 (1952)). Thus, a district court may consider procedural irregularities insofar as they rise to the level of requiring vacatur or modification of the award pursuant to sections 10 and 11 of the Arbitration Act. To hold otherwise would not serve the purposes of the Act.

■ Considering the assertions in the Derains Declaration and in the Morril Reply Affidavit that numerous rules of the ICC Court were violated, this Court finds those assertions unpersuasive. First and foremost, the Terms of Reference explicitly state under "The Issues to be Determined" the following issue: "Has CBS established a claim for damages, and, if so, in what amount?" Terms of Reference (hereinafter "TR"), annexed as Exhibit E to the Supplemental Affidavit of Mark C. Morril, Esq. (hereinafter "Morril Supp.Aff."), sworn to on February 16, 1988, at 4. No limitation on the amount of damages is present in this section of the Terms of Reference.[12] Only in the Rules of Proce-

---

12. Moreover, there is no requirement that the Terms of Reference include the amount of damages claimed. Article 13(1) of the ICC Rules of Arbitration deals with the Terms of Reference and provides:

dure, part VI of the Terms of Reference, are damages stated with any specificity. RP11 states: "Counsel for CBS having advised of the intention of CBS to include a claim for damages of from US$5,000,000 to US$10,000,000, leave is hereby granted to the parties to present any amendments of their pleadings at least 15 days before the commencement of the evidentiary hearings, or at a later time in the discretion of the Arbitrators." *Id.* at 8.

Derains points to the first Rule of Procedure contained in the Terms of Reference as requiring consistency with the ICC Rules. But that Rule of Procedure also vests the arbitrators with substantial discretion:

> All proceedings in this arbitration shall be governed by Paragraph 7.09 of the Franchise Agreement, by the Rules for the ICC Court of Arbitration, and, to the extent consistent with the ICC Rules, by the following Rules of Procedure ("RP"), reserving to the Arbitrators, however, the authority in their discretion, on application of a party or on their own initiative, to modify or suspend any of these Rules of Procedure.

TR, at 5. The arbitrators thus had the power to suspend the Rules of Procedure, in which the only limitations on damages were contained.

The ICC Court did indeed confirm the award, and when it did so, it had before it the Final Award. It also had before it the dissent filed by Mr. Sorenson alleging that the award of damages was unconscionably high and unsupported by the evidence. The fact of the matter is that the ICC Court nevertheless confirmed the award. Article 21 of the ICC Rules for Arbitration

requires scrutiny of any award by the ICC Court before it is signed. *See supra* n. 10. The ICC Court is the best judge of whether its procedural rules have been satisfied, and when it certified the award as final, it certified that the procedural rules had been complied with to its satisfaction. No violation of those rules constitutes a basis for vacatur of the award pursuant to section 10 of the Arbitration Act.

CBI asserts that vacatur is required because the award of consequential damages exceeded the arbitrators' power under the reasoning of *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.,* 607 F.2d 649 (5th Cir.1979). Respondent's Memo at 31–32. In *Totem Marine,* the Court of Appeals for the Fifth Circuit found that

> [t]he arbitration panel exceeded its powers by awarding damages for charter hire to North American. Not only did North American fail to list charter hire in its itemized statement of damages submitted to Totem, but in its brief submitted to the arbitration panel, North American conceded that charter hire was not an issue in the arbitration.
>
> \*   \*   \*   \*   \*   \*
>
> It is anomalous for the arbitration panel to award an unrequested item of damages three times larger than any item claimed by North American and then to hear the panel action supported with an argument that the awarded item was naturally intertwined within the scope of the arbitration.

*Id.* at 651. *Totem Marine* is distinguishable on several grounds. CBI knew from the outset that CBS was asserting a claim

---

Before proceeding with the preparation of the case, the arbitrator shall draw up, on the basis of the documents or in the presence of the parties and in the light of their most recent submissions, a document defining his Terms of Reference. This document shall include the following particulars:
a) the full names and description of the parties,
b) the addresses of the parties to which notifications or communications arising in the course of the arbitration may validly be made,
c) a summary of the parties' respective claims,

d) definition of the issues to be determined,
e) the arbitrator's full name, description and address,
f) the place of arbitration,
g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the arbitrator to act as amiable compositeur,
h) such other particulars as may be required to make the arbitral award enforceable in law, or may be regarded as helpful by the Court of Arbitration or the arbitrator.

**958**

for consequential damages. At no time did CBS deny that it was making such a claim. CBI was on notice that the arbitrators were considering the full amount of damages claimed by CBS, even though the pleadings and Terms of Reference were not amended. Moreover, unlike *Totem Marine*, in which the arbitrators decided an issue that was not submitted to them at all, the claim for damages in the instant case was within the Terms of Reference. The Court therefore declines to vacate the award on the basis that the award of consequential damages exceeded the arbitrators' powers.

*II. Effective Date.*

The parties cannot agree on the effective date of the Final Award. The effective date is defined in the Final Award:

"Effective Date of this Final Award" refers to the date on which the Secretariat of the International Court of Arbitration delivers signed copies of this Final Award to the parties or to their attorneys in this arbitration proceeding.

FA at 2. CBS contends that the effective date is January 28, 1988, the day on which the parties received the award from the arbitrators. Memorandum of Law in Further Support of Petitioner's Motion to Confirm an Arbitration Award and in Opposition to Respondent's Cross–Motion to Vacate or Modify the Award (hereinafter "Petitioner's Memo"), at 14. CBS claims that Chairman Piel made delivery with the approval of the ICC's Secretariat, and that Chairman Piel's delivery was therefore an agency delivery, satisfying the requirement of delivery by the ICC Secretariat. CBI contends that the effective date is Febru-

ary 4, 1988, the date on which the Secretariat forwarded a copy of the award to counsel, or February 8, 1988, the date on which counsel actually received such award.

The plain language of the Final Award states that the effective date is the date on which the Secretariat delivers the award to the parties or their attorneys. The Secretariat did, however, consent to the delivery by Chairman Piel, *see* letter dated February 4, 1988, annexed as Exhibit D to Petitioner's Memo. But it also delivered copies to counsel for the parties on its own. The letter from the Secretariat states that the "the Secretariat notified pursuant to art. 23 of the ICC–Rules of Arbitration one copy of the award to each counsel for the parties under cover of a letter dated February 4, 1988." *Id.* Article 6 of the ICC Rules of Arbitration provides that "[n]otification or communication shall be deemed to have been effected on the day when it was received or should have been received by the party itself or by its representative." ICC rules of Arbitration, Article 6. This Court therefore finds that the effective date of the Final Award, as that term is defined in the Final Award, is February 8, 1988, the date on which counsel for the parties received the award sent to them by the ICC Secretariat.

*III. Sanctions.*

Finally, CBS has moved for the imposition of sanctions on CBI pursuant to Rule 11 of the Federal Rules of Civil Procedure.[13] CBS asserts that International's cross motion and notices of deposition were

---

**13.** Rule 11 provides in pertinent part:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated.

\* \* \* \* \* \*

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not

interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

\* \* \* \* \* \*

If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
Fed.R.Civ.P. 11.

not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Petitioner's Memo at 16 (quoting Fed.R.Civ.P. 11). The standard for imposition of sanctions under Rule 11 in this Circuit was clearly set forth in *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), in which the Second Circuit stated: "where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated." *Id.* at 254.

This standard for imposition of sanctions is a very stringent one, and the Second Circuit has cautioned that district courts are to "resolve all doubts in favor of the signer." *Olivieri v. Thompson*, 803 F.2d 1265 (2d Cir.1986), *cert. denied, sub nom. County of Suffolk v. Graseck*, — U.S. —, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Based on this standard, the Court cannot say that the imposition of sanctions pursuant to Rule 11 is warranted by the facts of this case. Although the Court obviously did not find respondent's arguments persuasive, they were not patently meritless. Petitioner's request for imposition of sanctions under Rule 11 is therefore denied.

### CONCLUSION

The arbitration award is hereby confirmed. The Effective Date of the award is February 8, 1988. Petitioner's request for the imposition of sanctions pursuant to Rule 11 is denied.

Petitioner is ordered to submit a judgment in conformity with this opinion for approval by the Court.