**In the Matter of the Arbitration of Certain Controversies Between CARTE BLANCHE (SINGAPORE) PTE., LTD., Petitioner–Appellee, Cross–Appellant,**

v.

**CARTE BLANCHE INTERNATIONAL, LTD., Respondent–Appellant, Cross–Appellee.**

**Nos. 712, 822, Dockets 88–7731, 88–7747.**

United States Court of Appeals, Second Circuit.

Argued March 17, 1989.

Decided Oct. 30, 1989.

Sheldon H. Elsen, New York City (Clement J. Colucci, Melissa A. Cohen, Orans, Elsen & Lupert, New York City, of counsel), for petitioner-appellee, cross-appellant.

Mark C. Morril, New York City (Robert B. Kay, Barry A. Brust, Kay Collyer & Boose, New York City, of counsel), for respondent-appellant, cross-appellee.

Before MESKILL, MINER and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Carte Blanche International, Ltd. ("CBI") appeals from a judgment entered in the United States District Court for the South-

ern District of New York, Peter K. Leisure, *Judge*, confirming an award rendered, in an arbitration conducted under the Arbitration Rules (the "Rules") of the International Chamber of Commerce ("ICC") Court of Arbitration (the "Court"), in favor of appellee Carte Blanche (Singapore) Pte., Ltd. ("CBS"). CBS cross-appeals to restore the interest award made by the arbitrators, which the district court reduced.

We affirm the judgment of the district court.

### Background

CBS is a corporation organized and existing under the laws of Singapore and having its principal place of business in Singapore. CBI is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of New York.

In August, 1980, CBS and CBI entered into an agreement by which CBI enfranchised CBS to market and service Carte Blanche credit cards in Malaysia, Singapore and Brunei (the "Franchise Agreement"). In June, 1981, however, CBI decided to discontinue its international franchise business as soon as possible. CBS chose to continue as a franchisee, but was the sole international franchisee of CBI after 1981.

Disputes between the parties arose in the fall of 1984. CBS contends that commencing at least by then, CBI denied CBS benefits of the Carte Blanche system which it was required to provide under the Franchise Agreement. Specifically, CBS claims denial of access to (1) the 14–digit encoding system for Carte Blanche cards, (2) credit authorization terminal systems, and (3) prompt and regular issuance of warning bulletins to merchants with respect to lost, stolen and cancelled Carte Blanche cards, even though these services continued to be provided by CBI to its other (domestic) franchisees.

In December, 1984, there was disagreement concerning changes in the ownership of CBS. In September, 1983, the shareholders of CBS, members of the Tan family of Singapore, had transferred their shares in CBS to a family holding company, Global Equities Pte., Ltd. ("Global"). In December, 1984, fifty percent of the shares of Global were transferred to the MBf Holdings Perhad Group of Companies ("MBf"), a publicly listed owner of a group of diversified companies that included Malaysia's largest finance company. CBI claimed that these transfers violated several provisions of the Franchise Agreement, including Section 7.10, which provides in pertinent part that:

> [The Franchise Agreement] may not be assigned by either party.... The license and rights granted hereunder shall not be transferable, or the subject of a further license or sublicense by Franchisee; any attempted assignment of the Agreement or the license and rights granted thereunder in violation hereof shall be null and void and shall constitute a material breach and an event of default.

CBI also claimed a breach of Section 7.11(b) of the Franchise Agreement, which provides in pertinent part that:

> If [CBS] desires or is required to sell its business, CBI or a related affiliate of CBI shall have first option and right of first refusal to acquire [CBS'] stock or assets, name and proprietary rights and goodwill
>
> . . . .
>
> It is hereby understood and agreed that any transfer of shares within the family of companies belonging to the Global Insurance Co. SDN BHD group, shall not be construed as a sale of the business ... but shall nonetheless require the prior written consent of CBI, which consent shall not unreasonably be withheld.

CBI placed CBS on formal notice of default under the Franchise Agreement. CBS contended that such transfers did not breach the Franchise Agreement, or were at most technical violations, because they were only transfers of shares, not assignments of interests.

In October, 1985, CBI and CBS filed demands for arbitration with the ICC pursuant to paragraph 7.09 of the Franchise

Agreement, which provides in pertinent part:

All disputes between CBI and [CBS], except any dispute as to any unsettled charges on any cardmember charges, arising in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with said Rules. The arbitration panel shall apply the law stipulated in paragraph 7.12 hereunder. CBI and [CBS] shall each appoint one arbitrator and the two arbitrators so nominated shall designate a third arbitrator acceptable to both parties, failing which the ICC Court shall designate the third arbitrator. The arbitral award shall be final and binding on the parties in accordance with said Rules and shall be entitled to recognition and enforcement by virtue of comity, treaty, convention, or other applicable law. Judgment may be had on the arbitral award in any domestic or foreign court of competent jurisdiction.

CBS claimed that CBI had engaged in a reduction of essential services, as hereinabove described, and had also failed to implement the Franchise Agreement's renewal clause (as of March 1, 1985). CBS sought injunctive relief requiring CBI to honor the Franchise Agreement, and a declaration that it had been renewed after the expiration of its initial term.

CBI claimed that the ownership transfers hereinabove described constituted events of default, that CBS had disseminated unauthorized and false advertising and had failed to make timely payment of fees owed to CBI under the Franchise Agreement, and that the Franchise Agreement had expired. CBI sought declarations that CBS was in default and that the Franchise Agreement had expired, an injunction against CBS' continuing as a CBI franchisee, and "damages in an amount to be ascertained at a later date."

In May, 1986, CBS filed an amended demand for arbitration seeking, as an alternative to the injunctive relief previously demanded, damages for the loss of the value of its Carte Blanche franchise in the amount of $4,945,000 for the value of stock, $697,000 for reimbursement of certain loans taken by CBS to fund its franchise operations, and loss of earnings on the foregoing amounts estimated to be in excess of $1,000,000.

The ICC confirmed the appointments of William Piel, Esq., Professor Hans Smit, and Theodore Sorenson, Esq. as arbitrators for the arbitration to take place in New York City. On February 18, 1987, a majority of the panel consisting of Mr. Piel and Professor Smit found for CBS in an interim award from which Mr. Sorenson dissented. The majority concluded, in response to specific questions constituting part of the "Terms of Reference" adopted pursuant to Article 13 of the Rules for the conduct of the arbitration,[1] that CBI had wrongfully failed to provide CBS with system benefits required by the Franchise Agreement since at least the fall of 1984; that the ownership transfers described hereinabove either did not constitute breaches or were immaterial, or alternatively that any objection thereto was waived or was immaterial because CBI's consent to the transfers could not reasonably have been withheld; that CBS' use of the Carte Blanche name in connection with a travel business and, in advertising, in conjunction with the MBf name did not constitute a material breach of the Franchise Agreement; that other claims by CBI of improper or unauthorized advertising were not supported by credible evidence; that the Franchise Agreement remained in effect and had not expired; and ultimately, that:

Damages should therefore be awarded to CBS for the value of a promised business opportunity destroyed or gravely impaired, together with mandatory directions to both parties, as part of the award to be entered, designed to effect, with minimum further harm to either

---

**1.** Article 13 of the Rules requires the arbitration panel, at the outset of the arbitration, to "draw up ... a document defining [the panel's] Terms of Reference, ... [including] a summary of the parties' respective claims, ... [and a] definition of the issues to be determined."

party, the winding down of the franchise operation, the maximum feasible realization of CBS's accounts receivable, the settlement of inter-area voucher clearances, and the full return to CBI of the licensed intangible property....

The majority addressed the seventh issue stated in the Terms of Reference, relating to damages, as follows:

7. Has CBS established a claim for damages, and, if so, in what amount?

CBS has established a claim for damages.

A decision by this Tribunal as to the amount to be included in the Final Award which will be entered will be deferred until we have given the parties an opportunity to consult and, if possible, to come to agreement on the amount to be awarded.

After CBS and CBI consulted unavailingly in response to the quoted invitation, CBS expressed its view, at a subsequent meeting between the parties and the arbitrators, that: "we will have to ask leave to file an amended damages pleading to deal with the problems of consequential damages. A present estimate is that we are likely to suffer consequential damages in an amount not less than $3.5 million." Mr. Piel, the chairman of the arbitration panel, expressed the tentative view that an amended pleading might not be necessary for CBS to pursue its claim for consequential damages.

CBI's counsel objected generally to any claim for or award of "unlimited damages," adding that "I think we have to have some understanding, some notice of what the claim here is," and also contended that injunctive relief involving a continuation of the Franchise Agreement, rather than damages, should be awarded. With specific reference to the proposed amendment of the pleadings, CBI's counsel stated: "Nobody is interested obviously in incurring needless expense [2] but we have important rights to protect here and perhaps the most productive approach would be for the arbitrators to consider that issue and come back to us on it." No formal amendment of the pleadings thereafter occurred.

Nine days of further hearings were subsequently conducted on the issue of an appropriate remedy. On January 25, 1988, the arbitrators issued a final award of damages and costs to CBS, with Mr. Sorenson dissenting, as follows:

| | |
|---|---|
| 1) fair and reasonable value of CBS, including reasonable prospects for future profitability: | $4,300,000.00 |
| 2) consequential damages (operating losses and expenses): | $5,116,477.00 |
| 3) costs: | $ 312,161.20 |
| Subtotal: | $9,728,638.20 |
| Less: credit for CBI's transfer to CBS of rights in cardholder accounts: | − 735,000.00 |
| Total: | $8,993,638.20 |

---

The arbitrators also issued a series of injunctive rulings designed to secure an orderly termination of the franchise relationship. Damage payments were scheduled as follows:

1) 50% of "the total then owing" within thirty days of delivery of the final award to the parties by the ICC Secretariat;

2) 75% of "the total then owing" within sixty days of the "Termination Date" (defined as the earlier of (i) December 31, 1988 or (ii) the date when CBS

2. Both the parties and the arbitrators considered at this meeting the likelihood that a formal amendment of CBS' pleading increasing its claim for damages would result in the payment of a substantial additional fee to the ICC in Paris. The "administrative charge" imposed upon the parties to an ICC arbitration by the ICC for the services rendered by the Court is based upon the "sum in dispute."

makes a public announcement of the recall, cancellation or invalidation of all outstanding Carte Blanche credit cards); and

   3) 100% of "the total then owing" within twenty days of CBS' delivery to CBI, or destruction, of specified items of tangible property relating to the franchise relationship.

All of the above payments were to include interest accrued to the date of payment, at 10%:

   1) on $4,300,000 from April 15, 1985 to June 2, 1987;

   2) on $3,565,000 from June 2, 1987 to the date or dates of payment; and

   3) on $5,428,638.20 from the delivery of the final award to the parties by the ICC Secretariat to the date or dates of payment.

As required by Article 21 of the Rules, the award was submitted by the panel in draft form to the Court for approval "as to its form,"[3] and was thereafter issued by the panel.

On February 1, 1988, CBS applied to the United States District Court for the Southern District of New York for an order confirming the final award pursuant to section 9 of the Federal Arbitration Act.[4] In an opinion reported at 683 F.Supp. 945 (S.D.N.Y.1988), the district court confirmed the award but rejected CBS' request for the imposition of sanctions pursuant to Fed.R.Civ.P. 11. *See Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Int'l, Ltd.,* 683 F.Supp. at 959. In a subsequent unpublished opinion, the district court ruled that post-judgment interest should be at the rate of 7%, in accordance with 28 U.S.C. § 1961 (1982 & Supp. V 1987), rather than

at 10%, as specified in the arbitrators' final award.

This appeal followed.

## Discussion

CBI contends on appeal that the arbitrators (1) exceeded their power by permitting CBS to make a consequential damages claim allegedly outside the Terms of Reference by which the arbitration was submitted to them; (2) exceeded their authority by ignoring the express provisions of the Franchise Agreement to excuse CBS' use of the Carte Blanche mark in connection with a travel business and, in advertising, in conjunction with the MBf name; and (3) acted in manifest disregard of the law by excusing CBS' failure to seek the consent of CBI to (a) the transfer of CBS stock by the Tan family to Global, and (b) the subsequent sale of a fifty percent interest in Global to MBf.

CBS contends by cross-appeal that the district court erred in substituting the interest rate provided by 28 U.S.C. § 1961 (1982 & Supp. V 1987) for the ten percent rate specified in the arbitrators' final award.

For the reasons that follow, we reject all of these contentions and affirm the judgment of the district court.

### A. Scope of Review.

Sections 10 and 11 of the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11 (1982), provide relatively limited grounds for court review of an arbitration award. Section 10 authorizes vacation in the case of corruption, fraud, undue means, evident partiality or corruption in the arbitrators, specified

---

**3.** Article 21 of the Rules provides that the Court "may lay down modifications as to the form of the award and, without affecting the arbitrator's liberty of decision, may also draw his attention to points of substance. No award shall be signed until it has been approved by the Court as to its form."

**4.** Section 9 provides in pertinent part:
   If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any

time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.
   9 U.S.C. § 9 (1982).

misconduct or misbehavior on their part, or "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Section 11 provides for modification or correction of an award in the case of an "evident" and "material" miscalculation of a figure or misdescription of a person, thing or property, where the arbitrators have awarded upon a matter not submitted to them, or where there is an error in form not affecting the merits of the controversy.

▮ In addition to the above, an arbitration award may be vacated for manifest disregard of the law. As we said in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930 (2d Cir.1986):

> "Manifest disregard of the law" by arbitrators is a judicially-created ground for vacating their arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953). It is not to be found in the federal arbitration law. 9 U.S.C. § 10. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892–93 (2d Cir.1985); *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 432 (2d Cir.1974). The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *Bell Aerospace Company Division of Textron, Inc. v. Local 516*, 356 F.Supp. 354, 356 (W.D.N.Y.1973), *rev'd on other grounds*, 500 F.2d 921 (2d Cir.1974). To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by

the parties. *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577 (2d Cir.1967). Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.

808 F.2d at 933–34.

This constricted scope of court review is specifically applicable to procedural rulings by arbitrators. *See Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 890–91 (2d Cir.1982), and cases there cited. We note also Article 11 of the Rules, which specifies that in the absence of any provision in the Rules, arbitration proceedings thereunder shall be governed by "any rules which the parties (or, failing them, the arbitrator) may settle;" and Article 24 thereof, which provides:

1. The arbitral award shall be final.

2. By submitting the dispute to arbitration by the International Chamber of Commerce, the parties shall be deemed to have undertaken to carry out the resulting award without delay and to have waived their right to any form of appeal insofar as such waiver can validly be made.

It is clear, in view of all the foregoing, that court review of the arbitration award in this litigation is narrowly circumscribed. We now turn to the specific contentions of the parties.

### B. Consequential Damages.

▮ CBI's primary contention on appeal is that the arbitrators and the ICC Court

erred in permitting an award of consequential damages in the absence of appropriate amendment of the Terms of Reference. We disagree.

The Terms of Reference did not limit the amount of CBS' damages, but left it open. Part V of the Terms of Reference, entitled "The Issues to be Determined," set forth ten such issues in general terms. Issue number 7 stated: "Has CBS established a claim for damages, and, if so, in what amount?" No limitation was placed on the amount of damages that could be proved. Nor was any restriction set on the theories of damages that could be asserted.

The panel initially determined in February, 1987 that "[d]amages should ... be awarded to CBS for the value of a promised business opportunity destroyed or gravely impaired," but deferred any decision on the amount of damages pending efforts by the parties to negotiate a resolution of that issue. CBS thereafter reported to the panel on March 19, 1987, that those negotiations had proved unavailing, and stated that it would seek leave to file "an amended damages pleading" for consequential damages "in an amount not less than $3.5 million."

The Chairman of the panel then observed that "I am wondering whether those previously presented pleadings do not embrace the claims which you are now asserting for consequential damages." After further discussion, in which CBI's counsel participated, which addressed with some delicacy the additional administrative charge payable to the ICC (and ultimately to be borne by CBI as the losing party) in the event of such an amendment, *see supra* note 2 and accompanying text, CBI's counsel, after reference to the avoidance of "needless expense," suggested that "the arbitrators ... consider that issue and come back to us on it." No amendment to CBS' demand for arbitration or to the Terms of Reference was thereafter made.

At a subsequent hearing on May 27, 1987, CBI's counsel objected that "we are being asked to deal with a consequential damages claim of millions of dollars which has not been pleaded [and] which is not in the terms of reference...." The chairman of the arbitration panel stated in response that in view of Article 16 of the Rules, which stipulates that "[t]he parties may make new claims or counter-claims before the arbitrator on the condition that these remain within the limits fixed by the Terms of Reference," and the open-ended nature of the pertinent issue as framed in the Terms of Reference, which asked only whether "CBS [has] established a claim for damages, and, if so, in what amount," CBI's objection was reduced "to a question of fair notice, and we have been on notice since March ... 19th ... of such an enlarged claim." The chairman concluded:

I'm not saying it is a good claim; I'm not saying that it is going to result in an increase of anything that CBS gets. But I am saying that the objection that it is not within the terms of reference is simply mistaken.

We agree with the arbitrators' eminently reasonable conclusion that the consequential damages claim was within the Terms of Reference.

CBI points to Rule of Procedure 11 contained in the Terms of Reference, which states:

Counsel for CBS having advised of the intention of CBS to amend its Demand for Arbitration to include a claim for damages of from US$5,000,000 to US$10,000,000, leave is hereby granted to the parties to present any amendments of their pleadings at least 15 days before the commencement of the evidentiary hearings, or at a later time in the discretion of the arbitrators.

Assuming *arguendo* that the proceedings as they unfolded did not comply with this rule, the preamble to the Rules of Procedure reserved to the arbitrators "the authority in their discretion, on application of a party or on their own initiative, to modify or suspend any of these Rules of Procedure."

Furthermore, the final damages award was approved by the Court of the ICC in accordance with Article 21 of the Rules. *See supra* note 3 and accompanying text. As the district court pointed out, "[t]he ICC

Court is the best judge of whether its procedural rules have been satisfied, and when it certified the award as final, it certified that the procedural rules had been complied with to its satisfaction." 683 F.Supp. at 957.

CBI provided an expert witness, a former secretary general of the Court, who testified that the arbitration proceedings constituted a "gross violation" of the Rules and grafted an illegitimate concept of "notice" pleading onto the Rules. If purportedly expert testimony of this nature were to be credited in contravention of the determinations of arbitrators and supervisory arbitration authorities, little would be left of the rule that courts defer to arbitral determinations in all but the most unusual circumstances.

We conclude that the award of consequential damages did not exceed the arbitrators' authority.

### C. Unauthorized Use by CBS of the Carte Blanche Name.

■ One of the issues submitted to the arbitrators by the Terms of Reference was: "Has CBS or CBI violated the Franchise Agreement in any other manner?" Although CBI's demand for arbitration made no reference to the matter, CBI claimed in the course of the arbitration, and thereafter in the district court and here, that CBS violated the Franchise Agreement by using the Carte Blanche name in connection with the operation of a travel business and, in advertising, in conjunction with the MBf name.

The arbitrators concluded that any breach that may have occurred in this regard caused no harm and was immaterial, and the district court determined that they did not exceed their authority in doing so. We agree with the district court.

### D. Unauthorized Transfer of Shares.

CBI also challenges the arbitrators' decision with respect to the Global transaction, whereby the Tan family members who owned the stock of CBS transferred that stock to Global, a family holding company; and the MBf transaction, whereby fifty percent of the shares of Global were thereafter transferred to MBf. CBI claims that these transfers violated section 7.10 of the Franchise Agreement, which prohibits assignment of the "Agreement or the license and rights granted thereunder," and section 7.11(b) thereof, which provides CBI with a "first option and right of first refusal to acquire [CBS'] stock or assets, name and proprietary rights and goodwill" in the event CBS should undertake "to sell its business." Section 7.11(b) further provided that a transfer of shares within the Global family of companies would not be deemed a sale of the business, but would nonetheless require the prior written consent of CBI, which was not to be unreasonably withheld. CBI contends that the arbitrators acted in manifest disregard of law by excusing CBS' failure to seek and obtain CBI's consent to the Global and MBf transactions.

■ Both the arbitrators and the district court deemed section 7.10 of the Franchise Agreement inapplicable to both the Global and MBf transactions, reasoning that a transfer of shares by the shareholders of CBS, none of whom were parties to the Franchise Agreement, did not constitute an assignment of the "Agreement or the license and rights granted thereunder" by any party thereto. This view appears obviously correct. In any event, the arbitrators did not exceed their authority in adopting it.

Section 7.11(b) remains to be considered. With respect to the Global transaction, the arbitrators concluded that any noncompliance by CBS with the provision of section 7.11(b) requiring CBI's consent (not to be unreasonably withheld) to "any transfer of shares within the [Global] family of companies" was not a material breach of the Franchise Agreement justifying CBI in nonperformance of that agreement. This conclusion was both reasonable and well within the arbitrators' authority.

We next consider the impact of Section 7.11(b) upon the MBf transaction. CBI points out that California law governs the Franchise Agreement, in accordance with section 7.12 thereof. CBI then invokes

*Thrifty Oil Co. v. Batarse,* 174 Cal.App.3d 770, 220 Cal.Rptr. 285 (1985), which ruled that a sublessee of a gas station who failed to seek the required consent of the sublessor to a further sublease was barred from contending that the sublessor's consent could not, in any event, have been unreasonably withheld. California law precluded the unreasonable withholding of such consent.

CBI then points to the arbitrators' statement in their interim award that "even if CBI had a right to have its consent requested for the MBf transaction," any default by CBS in that regard was "mooted" because "[t]he mutual obligation of good faith implicit in the relationship would require that consent not be unreasonably withheld." CBI concludes that the arbitrators' ruling on this issue constitutes manifest disregard of *Batarse,* and accordingly of California law, within the meaning of *Merrill Lynch, Pierce, Fenner & Smith v. Bobker,* 808 F.2d 930, 933–34 (2d Cir.1986). We are unable to accept this view for several reasons.

The primary determination of the arbitrators as to pertinent California law was that the pertinent California cases "have ruled that a prohibition of, or the requirement of consent for, assignment of an agreement does not affect the freedom of the shareholders of a corporate party to the agreement to transfer their shares." As noted above, the arbitrators supplemented this determination by ruling that "in no event would we hold that [CBI] could arbitrarily refuse consent" to the MBf transaction. This ruling was clearly not essential to their resolution of the issue, and the ostensibly contrary authority of *Batarse* was apparently not cited to them in connection with that ruling.

We note, furthermore, the explicit statement in *Batarse* that: "There is no need to reach the issue, not involved herein, of the ramifications when the record reflects that a request for sublease would be a futile act." 174 Cal.App.3d at 776, 220 Cal.Rptr. at 289. Section 7.11(b) of the Franchise Agreement, it should be recalled, vested CBI with no right to bar the MBf transaction by withholding its consent, but only

with a right of first refusal to purchase the Global shares offered to MBf. Even assuming, therefore, that *Batarse* states a generally applicable rule of California law, the arbitrators would have been entirely justified in concluding that (1) it would have been a futile act for CBS to offer CBI a right of first refusal to purchase fifty percent of CBS' stock in view of CBI's determination (reached after the parties entered into the Franchise Agreement) to terminate non-domestic Carte Blanche operations, and accordingly that (2) *Batarse* did not require a determination of this issue in favor of CBI.

Finally, in responding in detail to CBI's contention that *Batarse* called for a resolution of the issue concerning the MBf transaction in CBI's favor, we do not mean to imply that an arbitrator's misreading or overlooking a single case law precedent would, in any event, ordinarily constitute "manifest disregard of the law" as explicated in *Bobker.*

We conclude, as did the district court, that the arbitrators acted well within their authority in their rulings concerning the Global and MBf transactions.

## E. Rate of Post–Judgment Interest.

■ CBS cross-appeals, contending that the rate of post-judgment interest in this case should not be governed by 28 U.S.C. § 1961(a) (1982 & Supp. V 1987) because the interest payments specified in the arbitral award under review were carefully designed to provide both CBS and CBI with incentives to comply with their respective obligations. CBI contends, on the contrary, that the provisions of section 1961(a) are mandatory.

Section 1961(a) provides in pertinent part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately

prior to the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

28 U.S.C. § 1961(a) (1982 & Supp. V 1987).

As has correctly been observed, "[t]he language of § 1961 is mandatory; it directs that interest *'shall be'* calculated at the rate allowed by state law.[5] Its terms do not permit of the exercise of judicial discretion in its application." *Akermanis v. Sea–Land Service, Inc.,* 521 F.Supp. 44, 57 (S.D.N.Y.1981), *rev'd on other grounds,* 688 F.2d 898 (2d Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

Further, as we stated in *Kotsopoulos v. Asturia Shipping Co., S.A.,* 467 F.2d 91 (2d Cir.1972):

> [T]he universal application of Section 1961 to all types of claims makes for logical uniformity. Once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. See Restatement of Judgments § 47 (1942). A single rule should govern interest on any such debt, the nature of the original claim having become irrelevant under the doctrine of merger.

467 F.2d at 95.

*Parsons & Whittemore Ala. Mach. & Servs. Corp. v. Yeargin Constr. Co.,* 744 F.2d 1482 (11th Cir.1984) (per curiam), is directly on point. There, in considering the enforcement of an arbitration award, the Eleventh Circuit ruled that the statutory rate in section 1961(a) governed, even though the arbitrators had established a different rate of post-judgment interest. The court said:

> Appellant's argument that enforcement of an arbitration award is not a judgment for which interest rates are statutorily regulated ignores the requirements of 9 U.S.C. § 13. This statute provides that a judgment entered by a federal court confirming, modifying, or correcting an arbi-

tration award "shall have the same force and effect, in all respects, as, and be subject to all provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." Although a district court enforcing an arbitration award does not engage in a de novo review of the award, and it may reverse or modify the award only on specified grounds, once the court enters its judgment, it has the same effect as any other judgment recovered following a civil trial. We therefore conclude that a district court judgment affirming an arbitration award is governed by statutory post-judgment interest rates.

*Id.* at 1484 (citations omitted).

CBS contends that *Parsons & Whittemore* involved a simple money judgment, whereas the judgment in the instant case enforces an arbitral award providing for future payments and offsets. We see no basis to conclude, however, that the instant judgment is for that reason not a "money judgment" within the meaning of section 1961(a). It is, after all, of the essence of post-judgment interest that it is assessed upon payments made pursuant to a judgment but subsequent to the entry of the judgment.

CBS also cites *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 784 F.2d 902 (9th Cir.1986), where the court enforced an arbitral interest award varying from the legal rate because it was deemed "possible . . . that the Panel's award of interest . . . was meant as an award of *consequential* damages" to which the court should defer, *id.* at 908. This approach lends itself to unpredictable and essentially unprincipled departures from the clear rules established by 28 U.S.C. § 1961(a) (1982 & Supp. V 1987) and 9 U.S.C. § 13 (1982). In any event, we see no basis to adopt it on the record before us in this case.

Finally, CBS argues that the arbitrators' interest award was carefully crafted to provide incentives for the parties to comply

---

**5.** 28 U.S.C. § 1961 was subsequently amended to substitute the Treasury bill rate for the state law rate.

with the complex injunctive aspects of the award, and that failure to enforce arbitral interest awards would lead to forum shopping for the enforcement of arbitral awards among jurisdictions with different rules concerning post-judgment interest. These arguments challenge the wisdom of the inflexible, unitary rule provided by section 1961(a) regarding post-judgment interest on money judgments awarded by federal district courts. Accordingly, they should be addressed to Congress, not this court. Furthermore, 9 U.S.C. § 9 (1982) includes specific authorization for parties to an arbitration agreement to specify the court in which any award made pursuant to the agreement shall be enforced.

### Conclusion

The judgment of the district court is affirmed.